PERRIN *v.* UNITED STATES

No. 78–959. Argued October 3, 1979—Decided November 27, 1979

BURGER, C. J., delivered the opinion of the Court, in which all other Members joined, except WHITE, J., who took no part in the decision of the case.

*Leonard B. Boudin* argued the cause for petitioner. With him on the briefs were *Robert G. Haik* and *Albert J. Ahern, Jr.*

*Stephen M. Shapiro* argued the cause for the United States. With him on the briefs were *Solicitor General McCree* and *Assistant Attorney General Heymann.*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari to resolve a Circuit conflict[1] on whether commercial bribery of private employees prohibited by a state criminal statute constitutes "bribery . . . in violation of the laws of the State in which committed" within the meaning of the Travel Act, 18 U. S. C. § 1952.

## I

Petitioner Vincent Perrin and four codefendants[2] were indicted in the Eastern District of Louisiana for violating the Travel Act, 18 U. S. C. § 1952, and for conspiring to violate the Act, 18 U. S. C. § 371. The Travel Act provides in part:

"(a) Whoever travels in interstate or foreign commerce

---

[1] See *United States* v. *Brecht,* 540 F. 2d 45 (CA2 1976), cert. denied, 429 U. S. 1123 (1977) (holding no violation of the Travel Act); *United States* v. *Pomponio,* 511 F. 2d 953 (CA4), cert. denied, 423 U. S. 874 (1975) (holding a violation of the Travel Act).

[2] Also indicted with petitioner were Duffy LaFont, Jr., David Levy, Albert Izuel, and Jim Haddox. Proceedings against Izuel and Haddox were severed by the trial court, and the charges were subsequently dismissed.

or uses any facility in interstate or foreign commerce, including the mail, with intent to—

"(1) distribute the proceeds of any unlawful activity; or

"(2) commit any crime of violence to further any unlawful activity; or

"(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

"and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"(b) As used in this subsection 'unlawful activity' means (1) any business enterprise involving gambling, liquor on which the Federal excise tax has not been paid, narcotics or controlled substances (as defined in section 102 (6) of the Controlled Substances Act), or prostitution offenses in violation of the laws of the State in which they are committed or of the United States, or (2) extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States."

The indictment charged that Perrin and his codefendants used the facilities of interstate commerce for the purpose of promoting a commercial bribery scheme in violation of the laws of the State of Louisiana.[3]

Following a jury trial, Perrin was convicted on the conspiracy count and two substantive Travel Act counts. He

---

[3] Louisiana's commercial bribery statute, La. Rev. Stat. Ann. § 14.73 (West 1974), provides in part:

"Commercial bribery is the giving or offering to give, directly or indirectly, anything of apparent present or prospective value to any private agent, employee, or fiduciary, without the knowledge and consent of the principal or employer, with the intent to influence such agent's, employee's, or fiduciary's action in relation to the principal's or employer's affairs."

received a 1-year suspended sentence on each of the three counts.

The Government's evidence at trial was that Perrin, David Levy, and Duffy LaFont engaged in a scheme to exploit geological data obtained from the Petty-Ray Geophysical Co. Petty-Ray, a Louisiana-based company, was in the business of conducting geological explorations and selling the data to oil companies. At trial, company executives testified that confidentiality was imperative to the conduct of their business. The economic value of exploration data would be undermined if its confidentiality were not protected. Moreover, public disclosure after sale would interfere with the contractual rights of the purchaser and would otherwise injure Petty-Ray's relationship with its customers.

In June 1975 LaFont importuned Roger Willis, an employee of Petty-Ray, to steal confidential geological exploration data from his employer. In exchange, LaFont promised Willis a percentage of the profits of a corporation which had been created to exploit the stolen information. Willis' position as an analyst of seismic data gave him access to the relevant material, which he in turn surreptitiously provided to the conspirators. Perrin, a consulting geologist, was brought into the scheme to interpret and analyze the data.

In late July 1975 Perrin met with Willis, LaFont, and Levy. Perrin directed Willis to call a firm in Richmond, Tex., to obtain gravity maps to aid him in his evaluation.[4] After the meeting, Willis contacted the Federal Bureau of Investigation and disclosed the details of the scheme. Willis agreed to permit conversations between himself and the other participants to be recorded. Forty-seven tapes were made, a large number of which were played to the jury.

The United States Court of Appeals for the Fifth Circuit

---

[4] The Government claimed at trial that Perrin purposefully chose an out-of-state supplier because it would be less likely to notice leasing activities in Louisiana.

affirmed Perrin's conviction, rejecting his contention that Congress intended "bribery" in the Act to include only bribery of public officials. The court also rejected challenges to the constitutionality of the Louisiana commercial bribery statute, to the sufficiency of the interstate nexus to establish jurisdiction under the Travel Act,[5] and to the failure of the trial judge to sever petitioner's trial from that of his codefendants.[6] 580 F. 2d 730.

## II

Petitioner argues that Congress intended "bribery" in the Travel Act to be confined to its common-law definition, *i. e.*, bribery of a public official. He contends that because commercial bribery was not an offense at common law, the indictment fails to charge a federal offense.[7]

The Travel Act was one of several bills enacted into law by the 87th Congress as part of the Attorney General's 1961 legislative program directed against "organized crime." Then Attorney General Robert Kennedy testified at Senate and House hearings that federal legislation was needed to aid state and local governments which were no longer able to cope with the increasingly complex and interstate nature of large-scale, multiparty crime. The stated intent was to "dry up" traditional sources of funds for such illegal activities. Legislation Relating to Organized Crime: Hearings on H. R. 468, H. R. 1246, etc., before Subcommittee No. 5 of the House Committee on the Judiciary, 87th Cong., 1st Sess. (1961)

---

[5] Phone calls from Louisiana to Richmond, Tex., by Willis and Levy, and the subsequent shipment of materials by the Richmond firm to Louisiana by Continental Bus were held to provide the interstate nexus jurisdictionally required to support the Travel Act prosecutions.

[6] LaFont and Levy were also convicted; the Court of Appeals affirmed. Petitions for certiorari have been filed by both LaFont, No. 78–5930, and Levy, No. 78–5855, and are pending before this Court.

[7] Perrin's other contentions, including a claim that the asserted ambiguity of the Travel Act resulted in failure to provide adequate notice that his conduct violated federal as well as Louisiana laws, do not merit discussion.

(hereinafter House Hearings); The Attorney General's Program to Curb Organized Crime and Racketeering: Hearings on S. 1653, S. 1654, etc., before the Senate Committee on the Judiciary, 87th Cong., 1st Sess. (1961) (hereinafter Senate Hearings).

To remedy a gap in the authority of federal investigatory agencies, Congress employed its now familiar power under the Commerce Clause of the Federal Constitution to prohibit activities of traditional state and local concern that also have an interstate nexus. See, *e. g.,* 18 U. S. C. § 1201 (federal kidnaping statute); 18 U. S. C. § 2312 (interstate transportation of stolen automobiles). That Congress was consciously linking the enforcement powers and resources of the Federal and State Governments to deal with traditional state crimes is shown by its definition of "unlawful activity" as an "enterprise involving gambling, liquor . . . , narcotics or controlled substances . . . , or prostitution offenses in violation of the laws of the State in which they are committed or of the United States." The statute also makes it a federal offense to travel or use a facility in interstate commerce to commit "extortion [or] bribery . . . in violation of the laws of the State in which committed or of the United States." Because the offenses are defined by reference to existing state as well as federal law, it is clear beyond doubt that Congress intended to add a second layer of enforcement supplementing what it found to be inadequate state authority and state enforcement.

We begin with the language of the Travel Act itself. *Southeastern Community College* v. *Davis,* 442 U. S. 397, 405 (1979); *TVA* v. *Hill,* 437 U. S. 153, 173 (1978). A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning. *Burns* v. *Alcala,* 420 U. S. 575, 580–581 (1975). Therefore, we look to the ordinary meaning of the term "bribery" at the time Congress enacted the statute in 1961. In light of Perrin's contentions we con-

sider first the development and evolution of the common-law definition.

At early common law, the crime of bribery extended only to the corruption of judges. 3 E. Coke, Institutes *144, *147 (1628). By the time of Blackstone, bribery was defined as an offense involving a judge or "other person concerned in the administration of justice" and included the giver as well as the receiver of the bribe. 4 W. Blackstone, Commentaries *139–*140 (1765). The writings of a 19th-century scholar inform us that by that time the crime of bribery had been expanded to include the corruption of any public official and the bribery of voters and witnesses as well. J. Stephen, Digest of the Criminal Law 85–87 (1877). And by the 20th century, England had adopted the Prevention of Corruption Act making criminal the commercial bribery of agents and employees. Act of 1906, 6 Edw. 7, ch. 34, amended by the Prevention of Corruption Act of 1916, 6 & 7 Geo. 5, ch. 64.

In this country, by the time the Travel Act was enacted in 1961, federal and state statutes had extended the term bribery well beyond its common-law meaning. Although Congress chose not to enact a general commercial bribery statute, it perceived abuses in the areas it found required particular legislation. Federal statutes specifically using "bribery" in the sense of payments to private persons to influence their actions are the Transportation Act of 1940, 49 U. S. C. § 1 (17)(b) (prohibiting the "bribery" of agents or employees of common carriers), and the 1960 Amendments to the Communications Act, 47 U. S. C. § 509 (a)(2) (prohibiting the "bribery" of television game show contestants).[8]

---

[8] Examples of federal statutes which make illegal the giving or receiving of payments to influence private duties but without using the word bribery are found at 18 U. S. C. § 215 (prohibiting payments to bank officers to influence their consideration of loans); 41 U. S. C. § 51 (prohibiting payments to contractors to secure subcontracts); and 29 U. S. C. § 186 (prohibiting payments to labor union officials).

44

A similar enlargement of the term beyond its common-law definition manifested itself in the states prior to 1961. Fourteen States had statutes which outlawed commercial bribery generally.[9] An additional 28 had adopted more narrow statutes outlawing corrupt payments to influence private duties in particular fields, including bribery of agents, common carrier and telegraph company employees, labor officials, bank employees, and participants in sporting events.[10]

[9] The statutes are currently codified at Conn. Gen. Stat. §§ 53a–160, 53a–161 (West 1972) (enacted 1905); La. Rev. Stat. Ann. § 14.73 (West 1974) (enacted 1920); Mass. Gen. Laws Ann., ch. 271, § 39 (West 1970) (enacted 1904); Mich. Comp. Laws § 750.125 (1968) (enacted 1905); Miss. Code Ann. §§ 97–11–11, 97–11–13 (1973) (enacted 1857); Neb. Rev. Stat. § 28–710 (1975) (enacted 1907); N. Y. Penal Law §§ 180.00–180.03 (McKinney Supp. 1978–1979) (enacted 1905); N. C. Gen. Stat. § 14–353 (1969) (enacted 1913); Pa. Stat. Ann., Tit. 18, § 4108 (Purdon 1973) (enacted 1939); R. I. Gen. Laws §§ 11–7–3, 11–7–4 (1970) (enacted 1881); S. C. Code § 16–17–540 (1977) (enacted 1905); Vt. Stat. Ann., Tit. 13, § 1106 (1974) (enacted 1904); Va. Code § 18.2–444 (1975) (enacted 1950); Wis. Stat. § 134.05 (1978) (enacted 1905). Of these 14, most had also enacted other private bribery statutes reaching labor, banking, or sports bribery.

[10] The current codifications of the statutes are found at Ala. Code § 13–4–9 (1977) (sports); Alaska Stat. Ann. § 42.20.110 (1976) (telegraph agent); Ariz. Rev. Stat. Ann. § 4–243 (1974), § 13–2309 (1978) (alcoholic beverages, sports); Ark. Stat. Ann. § 41–3288 (1977), § 67–707 (1966) (sports, banking); Cal. Penal Code Ann. §§ 337b–337e, 641 (West 1970) and Cal. Fin. Code Ann. § 3350 (West 1968) (sports, telegraph agent, banking); Colo. Rev. Stat. § 18–5–403 (1978) (sports); Del. Code Ann., Tit. 28, §§ 701–704 (1975) (sports); Fla. Stat. § 838.12 (1976) (sports); Haw. Rev. Stat. § 708–880 (1976) (sports); Ill. Rev. Stat., ch. 38, §§ 29–1 to 29–3 (1977) (sports); Ind. Code §§ 35–18–10–1, 35–18–10–2, 35–18–12–1, 35–18–12–2 (1976) (common carrier, sports); Iowa Code § 722.3 (1979) (sports); Ky. Rev. Stat. § 244.600 (1972), § 518.040–050 (1975) (alcoholic beverages, sports); Me. Rev. Stat. Ann., Tit. 17, § 3601 (1965) (labor); Md. Ann. Code, Art. 27, §§ 24, 25 (1976) (sports); Minn. Stat. § 609.825 (1964) (sports); Mo. Rev. Stat. § 570.155 (1978) (sports); Mont. Code Ann. § 94–35–221 (1978) (telegraph agent); Nev. Rev. Stat. §§ 614.140, 707.120 (1973) (labor, telegraph agent); N. J. Stat. Ann. §§ 2A:91–1,

In sum, by 1961 the common understanding and meaning of "bribery" had extended beyond its early common-law definitions. In 42 States and in federal legislation, "bribery" included the bribery of individuals acting in a private capacity.[11] It was against this background that the Travel Act was passed.

## III

On a previous occasion we took note of the sparse legislative history of the Travel Act. *Rewis* v. *United States,* 401 U. S. 808, 811 (1971). The record of the hearings and floor debates discloses that Congress made no attempt to define the statutory term "bribery," but relied on the accepted contemporary meaning. There are ample references to the bribery of state and local officials, but there is no indication that Congress intended to so limit its meaning. Indeed, references in the legislative history to the purposes and scope of the Travel Act, as well as other bills under consideration by Congress as part of the package of "organized crime" legislation aimed at supplementing state enforcement, indicate that

___

2A:93–7, 2A:93–10 (West 1969) (banking, labor, sports); Ohio Rev. Code Ann. § 2915.06 (1975) (sports); Okla. Stat., Tit. 21, §§ 399, 400 (1971) (sports); Ore. Rev. Stat. § 165.515 (1977) (telegraph agent); S. D. Comp. Laws Ann. § 36–18–28 (1967) (architects); Tenn. Code Ann. §§ 39–821, 39–824 to 39–826 (1975) (common carriers, sports); Tex. Penal Code Ann. §§ 32.43, 32.44 (1974) (attorneys, sports); Wash. Rev. Code §§ 49.44.020, 67.04.010 to 67.04.080 (1976) (sports, labor); W. Va. Code § 61–10–22 (1977) (sports).

Since 1961, of the eight States which had not adopted nonpublic official bribery statutes, Georgia, Kansas, New Hampshire, New Mexico, North Dakota, and Wyoming now have such statutes. Moreover, a number of the States which did not have a commercial bribery statute in 1961 do so today.

[11] See also ALI, Model Penal Code § 223.10, pp. 113–117, Comments (Tent. Draft No. 11, 1960) ("all relations which are recognized in a society as involving special trust should be kept secure from the corrupting influence of bribery"); ALI, Model Penal Code § 224.8 (Prop. Off. Draft 1962) (containing a specific prohibition against commercial bribery).

Members, Committees, and draftsmen used "bribery" to include payments to private individuals to influence their actions.

Senator Keating, for instance, expressed concern about the influence of gamblers and racketeers on athletics. He indicated his belief that the sports bribery scandals could be dealt with under the Travel Act. See Senate Hearings 327–328. Attorney General Kennedy in his opening statement in both the Senate and House hearings in 1961 expressed his concern that "gamblers have bribed college basketball players to shave points on games." House Hearings 25; Senate Hearings 6. In the consideration of a related bill to grant immunity to witnesses testifying in labor racketeering cases, repeated reference was made to the need to curb "bribery" of labor and management officials involved in labor disputes. See House Hearings 84. It is not suggested that the references to the immunity bill were intended to define the content of "bribery" in the Travel Act, yet they do indicate that Congress did not use the word in the narrow, common-law sense.

Petitioner also contends that commercial bribery is a "management" or "white-collar" offense not generally associated with organized criminal activities. See *United States* v. *Brecht,* 540 F. 2d 45, 50 (CA2 1976), cert. denied, 429 U. S. 1123 (1977). From this, he argues that Congress could not have intended to encompass commercial bribery within § 1952.

The notion that bribery of private persons is unrelated or unknown to what is called "organized crime" has no foundation. The hearings on the Travel Act make clear that a major area of congressional concern was with the infiltration by organized crime into legitimate activities. House Hearings 2 (remarks of Chairman Celler). Legitimate businesses had come to be used as a means for highly organized criminal activities to hide income derived from illegal sources. Moreover, Committees investigating these activities found that those who

infiltrated legitimate businesses often used the same criminal techniques to expand their operations and sales in the legitimate enterprises. Thus, in discussing the infiltration of organized groups into nongambling amusement games, the McClellan Committee reported that the organization achieved its holdings in legitimate business by "force, terror and the corruption of management, union and public officials." Final Report of the Select Committee on Improper Activities in the Labor or Management Field, S. Rep. No. 1139, 86th Cong., 2d Sess., 856 (1960).

Indeed, the McClellan Committee in 1960, like the Kefauver Committee in 1950–1951, documented numerous specific instances of the use of commercial bribery by these organized groups to control legitimate businesses. The McClellan Committee, for example, reported that a particular "shylocking" operation began in New York when persons were able to obtain a substantial unsecured line of credit at a New York bank "by making gifts to two of the bank officials." *Id.,* at 772–773. The Kefauver Committee explored, among numerous others, the relationship between a high-ranking official of the Ford Motor Co. and persons believed to be members of organized illegal groups. Its evidence suggested that organized crime had exploited that relationship to obtain Ford dealerships and hauling contracts. Third Interim Report of the Special Committee to Investigate Organized Crime in Interstate Commerce, S. Rep. No. 307, 82d Cong., 1st Sess., 75 (1951). See also *id.,* at 160–161 (expressing concern about "corruption of college basketball players who could be talked into controlling the score of a game").[12]

---

[12] Although congressional hearings subsequent to the passage of the Travel Act are not relied on, they do support the conclusion that bribery of private persons is a familiar tool of organized criminal groups. See Organized Crime, Stolen Securities: Hearings before the Subcommittee on Investigations of the Senate Committee on Government Operations, 92d Cong., 1st Sess., 675–683 (1971) (bribing of employees of banking institu-

There can be little doubt that Congress recognized in 1961 that bribery of private persons was widely used in highly organized criminal efforts to infiltrate and gain control of legitimate businesses, an area of special concern of Congress in enacting the Travel Act.

Our approach to ascertaining the meaning of "bribery" must be guided by our holding in *United States* v. *Nardello,* 393 U. S. 286 (1969), where the same provision of the Act under review in this case was before the Court. There, the respondents were charged with traveling in interstate commerce with the intent to engage in extortion contrary to the laws of Pennsylvania in violation of § 1952. Pennsylvania's "extortion" statute applied only to acts committed by public officials. However, the State had outlawed the particular conduct engaged in by the appellees under a statute entitled "blackmail." Nardello and his codefendants argued, as Perrin does here, that Congress intended to use the word "extortion" in its common-law sense, which would be limited to conduct by public officials.

An opinion by Mr. Chief Justice Warren for a unanimous Court rejected the argument limiting the definition of extortion to its common-law meaning, holding that Congress used the term in a generic and contemporary sense. The Court noted that in 1961 the Attorney General had pressed Congress to include "shakedown rackets," "shylocking," and labor extortion, which were methods frequently used by organized groups to generate income and infiltrate legitimate activities.

tions to accept pledges of worthless and stolen securities and of employees of brokerage houses to steal securities); Organized Crime, Techniques for Converting Worthless Securities into Cash: Hearings before the House Select Committee on Crime, 92d Cong., 1st Sess., 3, 242, 292–293, 361 (1971) (bribing of insurance company presidents to buy worthless securities for the company); Organized Crime, Securities: Thefts and Frauds: Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations, 93d Cong., 1st Sess., 183, 239–240, 467–468, 475–476 (1973) (bribing of certified public accountants and employees in financial institutions and brokerage houses).

In rejecting Nardello's argument that Congress intended to adopt the common-law meaning of the term "extortion," the Court stated:

"In light of the scope of the congressional purpose we decline to give the term 'extortion' an unnaturally narrow reading . . . and thus conclude that the acts for which appellees have been indicted fall within the generic term extortion as used in the Travel Act." 393 U. S., at 296.

We are similarly persuaded that the generic definition of bribery, rather than a narrow common-law definition, was intended by Congress.[13]

## IV

Petitioner also contends that a broad interpretation of the meaning of bribery will have serious federalism implications. He relies particularly on *Rewis* v. *United States,* 401 U. S. 808 (1971). See also *United States* v. *Bass,* 404 U. S. 336, 349–350 (1971). The factual setting in *Rewis* was very different from this case. There, we were confronted with a Travel Act prosecution of the proprietors of a gambling establishment located a few miles south of the Georgia-Florida state line. There was no evidence that Rewis had employed interstate facilities to conduct his numbers operation; moreover, he could not readily identify which customers had crossed state lines. The District Court had instructed the jury that if it found that third persons traveled from Georgia

---

[13] Our analysis leads us to reject the application of the maxim of statutory construction that ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity. *Bell* v. *United States,* 349 U. S. 81, 83 (1955). Although *Bell* states the general rule in cases where the courts are faced with genuine ambiguity, the rule of lenity applies " 'when we are uncertain about the statute's meaning,' " and is " 'not to be used in complete disregard of the purpose of the legislature.' " *United States* v. *Culbert,* 435 U. S. 371, 379 (1978), quoting *Scarborough* v. *United States,* 431 U. S. 563, 577 (1977). *Nardello* leaves little room for uncertainty about the statute's meaning.

to Florida to place bets, that would be sufficient to supply the interstate commerce element necessary to sustain the conviction of the proprietors under the Act. In reversing, we cautioned that in that setting "an expansive Travel Act would alter sensitive federal-state relationships, could overextend limited federal police resources, and . . . would transform relatively minor state offenses into federal felonies." 401 U. S., at 812.

Reliance on the federalism principles articulated in *Rewis* to dictate a narrow interpretation of "bribery" is misplaced. Our concern there was with the tenuous interstate commerce element. Looking at congressional intent in that light, we held that Congress did not intend that the Travel Act should apply to criminal activity within one State solely because that activity was sometimes patronized by persons from another State. *Ibid.*

Here, the sufficiency of the interstate nexus is no longer at issue. Rather, so long as the requisite interstate nexus is present, the statute reflects a clear and deliberate intent on the part of Congress to alter the federal-state balance in order to reinforce state law enforcement. In defining an "unlawful activity," Congress has clearly stated its intention to include violations of state as well as federal bribery law. Until statutes such as the Travel Act contravene some provision of the Constitution, the choice is for Congress, not the courts.

We hold that Congress intended "bribery . . . in violation of the laws of the State in which committed" as used in the Travel Act to encompass conduct in violation of state commercial bribery statutes. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE WHITE took no part in the decision of this case.