**In re The McGREALS, a partnership, Debtor.**

**Bankruptcy No. 96–11372SR.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 28, 1996.

Kurt F. Gwynne, Pepper, Hamilton & Scheetz, Philadelphia, PA, for Debtor.

William Levant, Lesser & Kaplin, P.C., Blue Bell, PA, for National Penn Bank.

Magdaline D. Coleman, Sagot, Jennings, & Sigmond, Philadelphia, PA, for Teamsters Pension Trust Fund of Philadelphia.

Barbara T. Dubrow, Sherr, Joffe & Zuckerman, P.C., West Conshohocken, PA, for MidLantic Bank, N.A.

Frederic J. Baker, Asst. U.S. Trustee, Office of the U.S. Trustee, Philadelphia, PA.

### *OPINION*

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court is the Motion of debtor the McGreals (the "Debtor") for an Order declaring that the Debtor's properties do not constitute "single asset real estate" within the meaning of §§ 101(51B) and 362(d)(3) of the United States Bankruptcy Code ("Code"), 11 U.S.C. §§ 101–1330, or in the alternative, an Order extending the time period set forth in Code § 362(d)(3) within which a single asset real estate debtor must file a plan of reorganization. A hearing on the Motion was held on August 5, 1996, after the conclusion of which, the Court took the matter under advisement.[1] For the reasons set forth below, the Court concludes that the subject properties do not satisfy the requirements of Code § 101(51B), and that accord-

1. The Motion was originally scheduled for a hearing to be held on May 15, 1996. When the parties appeared before the Court on that date, however, they submitted a stipulation of facts which provided, *inter alia,* that respondents National Penn Bank ("National") and Midlantic Bank, N.A. ("Midlantic") consented to an extension of the deadline set forth in Code § 362(d)(3) until August 15, 1996, without prejudice to the rights or defenses of any of the parties vis-a-vis the single asset realty issue, or to the rights of the Debtor to seek a further extension of the deadline, and National or Midlantic to oppose same. In light of the parties' agreement for an extension of time under Code § 362(d)(3), the Court adjourned the hearing on the Debtor's Motion until August 5, 1996.

ingly, the Debtor's request for a declaratory judgement will be granted.

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. §§ 1334 and 157(a), 157(b)(1), (b)(2)(A) and (O).

## BACKGROUND

At the hearing held on May 15, 1996, the Debtor, together with respondents National and Midlantic, submitted a stipulation of facts (the "Stipulation") to be considered by the Court in ruling on the Motion. The uncontested facts relevant to the instant matter follow.

The Debtor is a Pennsylvania partnership that was founded in 1988. In September of that year, the Debtor acquired two parcels of real property in Pottstown Borough, Montgomery County, Pennsylvania. The first parcel consisted of approximately 4.103 acres of improved land located at 980 Glasgow Street (the "Glasgow Property"). The principal improvement at the Glasgow Property is a 40,000 square-foot refrigerated manufacturing plant. The second parcel consisted of approximately 10.337 acres of raw land located at 231 Shoemaker Road (the "Shoemaker Property"). The two parcels (collectively, the "Properties") are partially adjacent to one another.[2]

The Glasgow Property was acquired by the Debtor by virtue of a deed from the Montgomery County Industrial Development Authority (the "MCIDA") dated September 30, 1988. While the MCIDA was the record owner of Glasgow, the property was, *inter alia*, subject to an installment sale agreement between the MCIDA as the seller, and Snow King Frozen Foods, Inc. ("Snow King"), the occupant of the property at the time, as the purchaser. The Shoemaker Property, on the other hand, was acquired by the Debtor directly from Snow King by virtue of a deed dated September 29, 1988. The deeds to both parcels were recorded in the Office of the Recorder of Deeds for Montgomery County on October 17, 1988, in book 4890, at pages 1379 and 1383, respectively.

On October 3, 1988, the Debtor executed two mortgages in favor of the National Bank of Boyertown ("NBB") on both the Glasgow and Shoemaker Properties as security for two loans, one in the amount of $300,000 and the other in the amount of $224,500, that had been extended to the Debtor on that same date. The mortgages were recorded in the Recorder's Office on October 17, 1988 in mortgage book 6361, at pages 926 and 963, respectively. National is NBB's successor in the foregoing transactions.

Both the Glasgow and Shoemaker Properties are also subject to mortgages that are now held by Midlantic. These include a $243,850 mortgage, dated November 12, 1993, and a mortgage dated March 29, 1995, in the amount of $1,400,000. The Midlantic mortgages are recorded in mortgage book 7306, at page 1168, and in mortgage book 7566, at page 1491, respectively.

The Debtor filed its petition for relief under Chapter 11 of the Bankruptcy Code on February 20, 1996, and since that time has continued in the possession of its assets and in the management of its business as a debtor in possession pursuant to Code §§ 1107(a) and 1108. As of the petition date, the Debtor's only real property consisted of the Glasgow Street and Shoemaker Road Properties. The personal property of the Debtor listed on Schedule "B" consisted of "cash on hand" in the amount of $544.00, and a lease agreement with former tenant Fred W. Nofer and Sons, Inc. ("Nofer"), dated October 3, 1988, to which no value was ascribed.[3] From the

---

2. Glasgow Street and Shoemaker Road are perpendicular cross streets. Exhibit "D–1", a hand-drawn diagram of the Properties, illustrates how the rear boundary of the Glasgow Property abuts a portion of the side boundary of Shoemaker.

3. The Stipulation also provided that the Debtor had acquired no additional real or personal property, nor had it received income from any source since the filing date of the petition. At the August 5, 1996 hearing, however, Debtor's counsel made an offer of proof in which he stated that subsequent to the date of the Stipulation the Debtor received $10,000 in settlement of a lease compromise claim with Nofer. The docket in this case reveals that the proposed settlement was approved by Order entered on August

time that the Debtor acquired the Properties, until the time that it filed its petition, its only significant source of income were the rents derived from the lease of the Glasgow Property to Nofer. At no time, either pre- or post-petition, did the Debtor conduct any business of its own on either parcel apart from the operation of the Properties themselves.

As of the filing date of the Motion, May 1, 1996, the Debtor had not yet filed a plan of reorganization. The 90th day after entry of the Order for Relief in this case was May 20, 1996. In the Stipulation, however, the parties agreed to an extension of the Code § 362(d)(3) deadline to August 15, 1996, without prejudice to the Debtor's right to seek a further extension, or to the right of either National or Midlantic to oppose same. At the August, 5, 1996 hearing, a further extension was granted that effectively covered the time during which the Motion would be under advisement by the Court.

The Stipulation also reserved the right of the parties to supplement the facts set forth above through the introduction of other admissible evidence into the record. The Debtor exercised this right at the August 5, 1996 hearing by introducing the testimony of Thomas McGreals ("McGreals"), a co-general partner of the Debtor. McGreals testified that apart from their partially common boundary, the Properties were wholly distinct from one another. In this vein, he testified that the Properties each have separate parcel numbers, and are taxed separately by local county and school taxing authorities. He also testified that Nofer did not utilize any portion of the vacant Shoemaker Property for any purpose. More specifically, he stated that Nofer did not use Shoemaker for additional storage space, nor as an additional entry point to, or departure point from, its facility located at Glasgow. With regard to the latter point, he testified that there was no practical means of ingress to, or egress from, the Glasgow Property through Shoemaker. This was apparently due, in

part, to both the existence of a drainage ditch that bisected the Shoemaker Property, and the fact that the frontage of that parcel had no driveway apron to the street, only straight curbing.

McGreals also testified that when the Debtor acquired both parcels it had no intention of combining them in any way to serve a unitary purpose. Specifically, he said that the Glasgow Property, already improved with a refrigerated building, was going to be leased to Nofer for use as a meat packing plant. He testified that Shoemaker Road, on the other hand, although undeveloped when acquired, was intended to be employed by the Debtor as the site of a "warehouse condominium" project that it planned to build in the future. McGreals testified that the Debtor's proposed development of Shoemaker as a storage facility was meant to be independent of its then ongoing operation of Glasgow as a rental property to Nofer.

Ultimately, however, the Debtor's development plan for Shoemaker never materialized. McGreals testified that in or about April or May of 1995, it was decided that the Shoemaker Property should be sold, essentially so that the Debtor could concentrate its efforts on the operation of its only income producing property, Glasgow. He testified that Tornetta Realty Corp. was selected as the real estate broker best qualified to market the unimproved Shoemaker lot, in part, based on his belief that Tornetta was one of the strongest realtors in Montgomery County.

He also testified that in or about September 1995, sometime after Nofer closed, the Debtor decided to sell the Glasgow Property as well. He testified that with respect to the sale of this parcel a different broker was chosen, one that he felt could help match a buyer to the specific use for which the building was already tailored. He testified that the broker selected, Jackson Cross Company Realtors, had national connections through an affiliate called "Encore" that he believed better qualified them to reach a national

30, 1996. In addition, Debtor's counsel stated that the Debtor had also received a $15,000 deposit pursuant to an agreement of sale with Foster Manufacturing Company for the purchase of a portion of the Shoemaker Property. From

testimony received at the hearing, however, the completion of the proposed sale now appears circumspect. Counsel did not state whether the deposit monies would be retained by the Debtor if Foster failed to go through with the purchase.

market of potential buyers for the Glasgow Property.

After the petition was filed, the Debtor sought, and obtained, permission to retain both Tornetta and Jackson Cross to continue marketing the Properties separately. He testified that eventually a buyer for a portion of the Shoemaker Property—the rear section that abuts the Glasgow Property—was located, and that an agreement of sale was executed and approved by the Court. He added, however, that the sale no longer appeared likely to be completed due to a change of circumstances that had taken place at Foster. He testified, though, that if the sale were to go through, the Properties would no longer share a common boundary.

McGreals identified Exhibit "D–2", as the appraisal report on both the Glasgow and Shoemaker Properties that was prepared as part of the loan agreement with Midlantic. The appraisal reveals a valuation of $875,000 for Glasgow, and $360,000 for Shoemaker, for a combined total of $1,235,000, as of April 12, 1995. National admitted in its response to the Motion that its own appraisal of the Properties reflected values of $720,000 and $350,000, respectively. National Response, ¶ 10. McGreals testified that he believed that since the Midlantic appraisal was prepared, the Glasgow Property had appreciated to $900,000 and the Shoemaker Property to $400,000. The aggregate amount of the secured proofs of claim filed by National is $447,100.[4] Midlantic admitted in its response to the Motion that the aggregate of its secured claims is $713,000. Midlantic Response, ¶ 12.

Apparently intending to preempt National from seeking relief from the automatic stay under Code § 362(d)(3), the Debtor filed the instant motion for a determination that the Properties do not constitute "single asset real estate" within meaning of that section and Code § 101(51B). The Debtor posits that the Properties do not satisfy the "single property or project" requirement of Code § 101(51B), essentially because they are in fact separate parcels of real property, i.e., they have separate parcel numbers, and are taxed separately by the respective county and school taxing authorities, and because the Debtor never intended to, and in fact never did, use the parcels together to serve a single purpose. Alternatively, the Debtor contends that even if the Court were to determine that its Properties do constitute single asset real estate, cause nonetheless exists to extend the time period prescribed by Code § 363(2)(d)(3), within which the Debtor must file its plan, due to the equity cushion enjoyed by both National and Midlantic.

National, on the other hand, contends that the Properties do constitute single asset real estate because, *inter alia*, both parcels were in effect acquired from a single grantor[5] at approximately the same time, and because the Debtor does not conduct any business of its own on either of the Properties except for the business of holding such properties for the purpose of renting them to others. National also seems to contend that the specific use for which either parcel was, or could be, employed by a particular tenant of the Debtor is irrelevant to the single asset realty question since the Debtor's use of the Properties, i.e., the leasing of same to others, would be the same in either case. Midlantic, in stark contrast to the position of National, contends that the Properties do not constitute single asset real estate for essentially the same reasons as those asserted by the Debtor.

## DISCUSSION

■ The foregoing request of the Debtor—for a determination that the Properties do not constitute "single asset real estate"— was precipitated by the amendments made to the Bankruptcy Code under section 218 of the Bankruptcy Reform Act of 1994. Pub.L.

4. National filed two secured proofs of claim on or about April 22, 1996, in the approximate amounts of $261,948, and $185,152, respectively.

5. National argued that while admittedly Glasgow was deeded to the Debtor by the MCIDA, the MCIDA was only the nominal owner of the prop-

erty due to the installment sales contract with Snow King. National posits, therefore, that Snow King was also a grantor of the Glasgow Property in the transaction whereby the Debtor acquired title to the property.

No. 103–394, 108 Stat. 4106 (1994). The primary purpose of the amendments was to place single asset real estate cases, a distinct species of bankruptcy cases, on an expedited procedural track. *See generally, In re Kkemko, Inc.,* 181 B.R. 47, 49 (Bankr. S.D.Ohio 1995); *accord In re LDN Corp.,* 191 B.R. 320, 326–27 (Bankr.E.D.Va.1996). Of particular import here is Code § 362(d) which was amended by the addition of new subsection (3), and now reads as follows:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
>
> . . . .
>
> > (3) with respect to a stay of an act against *single asset real estate* under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless not later than the date that is 90 days after the entry of the order for relief (or such date as the court may determine for cause by order entered within that 90–day period)—
> >
> > > (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time. . . .

11 U.S.C. § 362(d)(3)(A) (emphasis added).

The key term in the above statute, "single-asset real estate", is defined by Code § 101(51B), also added to the Code as part of the 1994 amendments, which states, in pertinent part, that:

> 'single asset real estate' means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental thereto having aggregate non-contingent, liquidated secured debts in an amount no more than $4,000,000.

■ Previously, this Court had the opportunity of discussing the foregoing amendments in *In re Philmont Development Co.,* 181 B.R. 220 (Bankr.E.D.Pa.1995). There, it was observed that Code § 101(51B) enumerates four criteria that must exist before real property will be considered single asset real estate for purposes of Code § 362(d)(3). These criteria are: (1) the subject real property must constitute a "single property or project", other than residential real property with fewer than four residential units; (2) the real property must generate substantially all of the income of the debtor; (3) the debtor must not be involved in any substantial business on the real property other than the operation of such property; and (4) the debtor's aggregate non-contingent, liquidated secured debt must be less than $4,000,000 in amount. *Id.* at 223.

It does not appear subject to dispute that at least three of the above criteria are applicable here. First, it is undisputed that the only real property owned by the Debtor, both pre- and post-petition, were the Glasgow and Shoemaker Properties, and that neither of these parcels fall within the exception covering residential real property with fewer that four residential units. Second, the Debtor's only substantial source of income came from the rentals that it received from its lease of the Glasgow Property to Nofer. Third, the Debtor conducted no business of its own on either parcel apart from the operation of the Properties themselves. Fourth, the Debtor's aggregate non-contingent, liquidated secured debt, in the approximate amount of $1,160,-100, is significantly less than the $4,000,000 limit set by the statute. The only question remaining, therefore, is whether the Properties satisfy the "single property or single project" requirement of the first criterion.

As noted in *Philmont,* the single property or project requirement of Code § 101(51B) brings within the purview of the statute two distinct classifications of real property. *Philmont Development,* 181 B.R. at 224. Since there is no doubt in this case that more than a single parcel of real property is involved, the issue to be decided can be further narrowed to the question of whether the Properties, collectively, constitute a "single project" as that term is used in Code § 101(51B). Precisely what Congress in-

tended the meaning of this term to be, however, is not made clear by the statute or its legislative history. Moreover, a review of the relevant case law reveals that there are no published decisions more recent than the Court's own decision in *Philmont Development* that interpret and apply this specific provision.

Turning to *Philmont Development*, therefore, the Court observes that, similar to the instant case, the determining issue there was whether several distinct parcels of real property constituted a "single project". The primary debtor in that case, Philmont Development Company, was the general partner of three debtor limited partnerships, namely Philmont Meadows Ltd. Partnership # 1, # 2, and # 3. There, the debtor/developer built several series of virtually identical semi-detached houses on Blakeslee Drive in Philadelphia, Pennsylvania. A number of the semi-detached houses were subsequently sold to each of the debtor limited partnerships. To wit: debtor/limited # 1 purchased the series of homes located 13020–13030 Blakeslee Drive; debtor/limited # 2 purchased the series of homes located at 13008–13018 Blakeslee Drive; and finally, debtor/limited # 3 purchased the series of homes located at 13032–13040 Blakeslee Drive. Both the debtor/developer and each of debtor/limiteds granted a mortgage against their respective interests in the properties to a financial institution that was later succeeded to by Chemical Bank.

Approximately 103 days after the filing of the petitions, Chemical sought relief from the automatic stay in each of the jointly administered cases pursuant to Code § 363(d)(3).

As of that time none of the debtors had filed a plan of reorganization. After concluding that factors two through four of Code § 101(51B) were present, the Court determined that the single asset realty question turned on whether the related debtors' several properties constituted a "single project" within meaning of that section. In examining this issue, the Court took note of the myriad pre-amendment decisions involving a commonly recurring bankruptcy situation that was often referred to in the colloquial as the "single asset real estate case".[6] Congress was aware of this body of law when it drafted the amendments that resulted in Code §§ 101(51B) and 362(d)(3). *Philmont Development*, 181 B.R. at 223; accord, *Kkemko*, 181 B.R. at 50. Against this background, the Court held, inter alia, that the string of semi-detached houses in *Philmont* constituted a single project. This determination stemmed from the fact that the lots had been purchased, developed, sold and then rented to third parties by the several related debtor entities pursuant to a common plan designed to achieve this end. The key factor leading to this conclusion was that the several distinct properties involved were all linked together for a common purpose.

For purposes of the instant case, the lesson from *Philmont* is that is that in order for two or more separate properties to constitute a single project within meaning of Code §§ 101(51B), the properties must be linked together in some fashion in a common plan or scheme involving their use.[7] The mere fact of common ownership, or even a

---

**6.** The situation typically involved an apartment or office building, hotel, or "strip" shopping center owned by an entity whose sole business activity consisted of operating the property with the income it generated. For one reason or another the owner would become unable to keep up with the payments to its major secured lender. Faced with the prospect of losing the property to the lender, the owner would typically attempt to save the property by filing a petition for relief under Chapter 11, oft-times with little or no hope of being able to come forward with a confirmable plan.

**7.** This interpretation of the term "single project" to require an element of commonality in the use of multiple properties is consistent with the com-

monly accepted meanings of the component words "single" and "project". *See Perrin v. U.S.*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979) (stating that it is a fundamental canon of statutory construction that the words chosen by Congress are to be interpreted according to their "ordinary, contemporary, common meaning"). For example, the word single means, inter alia, "unaccompanied by others: LONE, SOLE" and/or "consisting of or having only one part, feature or portion". Webster's New Collegiate Dictionary, 1075 (1981). The word project means, inter alia, "a specific plan or design: SCHEME", and/or "a planned undertaking". *Id.* at 913.

common border, will not suffice.[8] The requisite element of a common plan or scheme, however, is missing in this case. The undisputed facts principally revealed only that the Debtor owns two parcels of real property that share a partially adjacent border, and that one parcel was rented, while the other parcel, raw land, was not. Moreover, McGreals credibly testified that the Debtor had no plans to combine the Properties in any way. His testimony established that after the Debtor abandoned its plans to develop the Shoemaker Property into a "warehouse condominium", it sought to sell that parcel in order to concentrate its efforts on the operation of its income producing property, Glasgow. Finally, his testimony established that the Debtor decided to sell the Glasgow Property only after its tenant left the property. At bottom, the facts presented failed to reveal any common link in usage between the Properties as had been the case in *Philmont.* Since the Properties were not used together in a manner that would comprise a single project, the requirements of Code § 101(51B) have not been met.

Based on the foregoing, the Court concludes that the Debtor's Properties do not constitute "single asset real estate" for purposes of Code §§ 101(51B) and 362(d)(3). Accordingly, the Debtor's Motion for a declaratory judgment to that effect will be granted. An Order consistent with the foregoing findings of fact and conclusions of law will be entered.

*ORDER*

AND Now, this 28th day of October, 1996, upon consideration of the Motion of the McGreals (the "Debtor") for an Order declaring that the Debtor's properties do not constitute "single asset real estate", or in the alternative, an extension of the time period set forth in section 362(d)(3), the Stipulation of facts among National Penn Bank, Midlantic Bank, N.A., and the Debtor, after notice and a hearing being held, and for the reasons stated in the accompanying Opinion, it is hereby

**ORDERED** that the Debtor's Motion is **Granted,** and that accordingly, it is determined that the real properties of the Debtor located in Pottstown Borough, Montgomery County, Pennsylvania, at 981 Glasgow Street, and 231 Shoemaker Road, respectively, do not constitute single asset real estate within meaning of Code §§ 101(51B) and 362(d)(3).

**8.** For example, one can imagine a situation in which two non-contiguous parcels of real property owned by the same debtor would be considered a single project. For the sake of this example, the properties may be separated by a third parcel owned by a stranger, or could even be located across the street from one another. Suppose further, that a building rented by the debtor to others is located on one parcel and that a parking lot is located on the other. Finally, assume that in one case the parking lot is operated for the exclusive use of the tenants of the building, and in another case that the lot is operated by the debtor as a stand alone business to service the parking needs in a typical downtown area, or is leased to a third party for this same purpose. The properties in the former situation would constitute a single project for purposes of Code § 101(51B) since they are essentially operated together to serve a common purpose; the operation of the building by the debtor as a rental property. The properties in the latter situation, however, would not satisfy the single project requirement because the element of commonality in their use is missing. Moreover, the foregoing result would be the same even if the properties were to share a common border, since the use of the properties relative to each other would remain unchanged. Thus, while the existence of a common owner or of a common border are certainly factors to be considered under Code §§ 101(51B), these factors alone, or in combination, are not determinative of the single project issue.