SELYA, Circuit Judge
(concurring in part and dissenting in part).
In recent months, the securities industry has been wracked by a treacherous combi *150 nation of market forces, overly optimistic risk-taking, and lapses in judgment. The majority proposes to add to this perfect storm by judicial enlargement of the scope of primary liability for violations of the antifraud provisions of the securities laws. I have come to conclude that this path-breaking step, though taken in the guise of an interpretation of Rule 10b-5, involves nothing less than a rewriting of that rule. In the bargain, it stretches the concept of primary liability beyond what I believe the Supreme Court would countenance and allows the SEC to cast a wider net than any court has ever thought possible.
I view this radical departure as an unwarranted usurpation of legislative and administrative authority. Thus, I respectfully dissent from Part V of the majority opinion. At the same time, I agree with the majority’s holding that the SEC has stated a cognizable claim under section 17(a)(2) of the Securities Act of 1933. I am nonetheless concerned that the language in which the majority couches this holding is overly broad. Thus, I concur in the judgment as to that issue without joining Part IV of the majority opinion.
My exegesis begins with the text of the relevant statute and rule. See Cent. Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 173, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). Section 10(b) of the Exchange Act of 1934 renders it unlawful for a person “directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe.” 15 U.S.C. § 78j(b). The “in contravention of such rules” language invites clarification of the statute through rulemaking. The SEC has obliged.
The rule providing clarification in this instance is Rule 10b-5(b). That provision prohibits “any person” from “directly or indirectly ... makfing] any untrue statement of a material fact or ... omit[ting] to state a material fact.” 17 C.F.R. § 240.10b-5(b). My disagreement revolves around the proper interpretation of the first element of a Rule 10b-5(b) violation: a material misstatement made by the defendant.
In my view, the verb choice is critical to an understanding of the rule. Yet the majority casually conflates this carefully chosen verb (“make”) with a very different verb (“use”) in order to impose primary liability on defendants who have not “made” any misstatements but, rather, are alleged to have used prospectuses that contain misstatements crafted by others. See ante at 131-32. The word “make” is not infinitely elastic — and I do not think that it either can or should be interpreted so expansively. To make a bad situation worse, the majority’s confusion of these two distinct verbs flies in the teeth of the Supreme Court’s circumspect vision of primary liability with respect to the antifraud provisions of the securities laws. Let me briefly sketch the background and then explain the basis for these two conclusions.
In this civil enforcement action, the SEC accuses the defendants of sins of commission, not sins of omission; that is, of making untrue statements of material fact. For present purposes, then, the pivotal word in the rule is “make.” Rule 10b-5 does not define that word, and the Supreme Court has not directly addressed its meaning in this setting.[51] Thus, it seems *151 logical to consult the dictionary in order to glean the essence of the word. See, e.g., Perrin v. United States, 444 U.S. 37, 42, 100 S.Ct. 311, 62 L.Ed.2d 199 (1979).
To “make” means to “act” or “cause to exist, occur, or appear,” or “create [or] cause.” Webster’s Third New International Dictionary 1363 (1993). The SEC charges these defendants, in substance, with passing along to brokers, dealers, and customers prospectuses containing false statements of material fact created by others.[52] To stretch the word “make” to cover that conduct, so that an underwriter’s status as such renders him per se liable for others’ statements, requires a freewheeling interpretation that disregards both plain meaning and orthodox definitions. There is no principled justification for such an interpretation; in the last analysis, it amounts to a thinly-disguised attempt to rewrite the rule. That is a step forbidden to us as judges. See Robinson v. Shell Oil Co., 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997); United States v. Charles George Trucking Co., 823 F.2d 685, 688 (1st Cir.1987).
There is a further problem. The majority’s freewheeling approach blurs the line that the Supreme Court has taken pains to draw between primary and secondary liability with respect to the antifraud provisions of the securities laws. As Rule 10b-5(b) itself suggests, that line should be kept sharp and clear: a person who does not actually make or affirmatively cause to be made a materially false statement may be held hable as a secondary violator (for aiding and abetting), but he cannot be held liable as a primary violator. See In re: Charter Commc’ns, Inc., Sec. Litig., 443 F.3d 987, 992 (8th Cir.2006), aff'd sub nom. Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., — U.S.-, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008).
Central Bank is of central importance in arriving at this conclusion. The majority labors to downplay the significance of Central Bank by remarking the obvious: that the Court did not address the specific issue with which we are faced. See ante at 136-37. But even though Central Bank’s holding does not explicitly control here, its teachings cannot be so blithely dismissed. While the decision there left open the precise boundaries of primary liability, it remains the beacon by which courts must steer in navigating the interpretive channels that run through the antifraud provisions of the securities laws.
In Central Bank, the Supreme Court laid out its approach to interpreting section 10(b) in private securities actions. 511 U.S. at 167-90, 114 S.Ct. 1439. The Court emphasized that a correct interpretation must center on the language of the statute itself. Id. at 175, 114 S.Ct. 1439. It admonished that expansive readings of such statutes, based on judicially manufactured policy rationales, should be avoided. Id. at 188-89, 114 S.Ct. 1439 (stating that “[pjolicy considerations cannot override our interpretation of the text and structure of the Act”).
That prescription comprises the gold standard for courts embroiled in securities *152 fraud litigation. Fairly read, the Court’s opinion counsels against superimposing judicial policy preferences on unsympathetic language in a statute or rule. The majority opinion disregards that wise counsel.
Central Bank is informative in another respect as well. The Court specifically held that a private plaintiff cannot maintain an action for aiding and abetting under section 10(b) or Rule 10b-5. Id. at 191, 114 S.Ct. 1439. As a result, the line between primary violators and secondary violators has become highly significant for those who deal in securities. That line has ready application here.
There is no need for me to reinvent this particular wheel, for the Second Circuit has gotten it exactly right: “if Central Bank is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).” Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir.1998) (quoting Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir.1997)); accord Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1226-27 (10th Cir.1996) (“Reading the language of § 10(b) and 10b-5 through the lens of Central Bank of Denver, we conclude that in order for [defendants] to ‘use or employ’ a ‘deception’ actionable under the antifraud law, they must themselves make a false or misleading statement. ...”). The majority opinion in this case effectively relegates these sensible precedents to the scrap heap — and it does so without any meaningful support in the case law.[53]
I find further support for a plain-meaning interpretation of Rule 10b-5(b) in a comparison of its text with that of section 17(a) of the Securities Act of 1933. It is common ground that Rule 10b-5 was devised after and in light of section 17(a). See United States v. Persky, 520 F.2d 283, 287 (2d Cir.1975). For the most part, the rule’s provisions mirror the counterpart provisions contained in section 17(a). Compare 17 C.F.R. § 240.10b-5(a) (“to employ any device”), and id. § 240.10b-5(c) (“to engage in any act”), with 15 U.S.C. § 77q(a)(l) (“to employ any device”), and id. § 77q(a)(3) (“to engage in any transaction”). There is a notable difference in language, however, between Rule 10b-5(b) and its counterpart provision, section 17(a)(2). The former uses the word “make,” 17 C.F.R. § 240.10b-5(b), while the latter uses the phrase “by means of,” 15 U.S.C. § 77q(a)(2). It would be foolhardy to gloss over this striking divergence or to view it as mere linguistic happenstance. It represents a purposeful choice of language and, as such, it must be given effect.[54] See United States v. Ah- *153 levs, 305 F.3d 54, 59-60 (1st Cir.2002) (discussing court’s obligation to “presume that ... differential draftsmanship was deliberate”); cf. Nalley v. Nalley, 53 F.3d 649, 652 (4th Cir.1995) (“When the wording of an amended statute differs in substance from the wording of the statute prior to amendment, we can only conclude that Congress intended the amended statute to have a different meaning.”). Doing so bars a court from reading “make” so open-endedly as to distort its meaning and, in the same fell swoop, obscure the obvious distinction between “make” and “by means of.” The majority’s rendition ignores this distinction.
In an apparent effort to blunt the force of this reasoning, the majority places weight on the fact that this is an SEC enforcement action rather than a private securities fraud suit. See ante at 130. I agree with the majority’s conclusion that the absence of any need to show reliance in an SEC enforcement action means that the SEC is not required to demonstrate public attribution. See SEC v. Wolfson, 539 F.3d 1249, 1260 (10th Cir.2008) (declining to impose a public attribution requirement in an SEC enforcement action “given the unambiguous connection between reliance and attribution, and the fact that the SEC need not prove reliance”). But for present purposes, this is thin gruel: the absence of any need to prove reliance does not allow a court to dismantle Central Bank’s interpretive prescription in its entirety.[55] SEC enforcement actions have no reliance requirement because they are meant to protect the public generally. See Schellenbach v. SEC, 989 F.2d 907, 913 (7th Cir.1993). That fact does not give the SEC carte blanche to punish under a primary liability framework those whose conduct is not proscribed by the language of the relevant statute or rule. Nor does the absence of a reliance requirement give a court a reason to expand the scope of primary liability for violators of the anti-fraud provisions of the securities laws.
The majority concludes that “making” can be “implied.” Ante at 135. This is exactly the sort of judicial adventurism against which the Central Bank Court warned. While I fully agree that underwriter-executives owe a duty to their clients and to those who purchase securities, a breach of that duty, without more, does not expose those executives to whatever liability the SEC decides to impose. The SEC’s attempt in this case to employ Rule 10b-5(b) to punish such a breach impermissibly equates a passive omission — failing to correct a false statement made by another — with the affirmative misconduct that the language of the rule targets.[56]
If more were needed — and I doubt that it is — -the precedents are telling. Although this case is one of first impression, the courts of appeals in the aftermath of Central Bank generally have chosen one of *154 two tests, limned by the majority, see ante Part V.B.2, as an aid in drawing the line between primary and secondary liability. Compare, e.g., Wright, 152 F.3d at 173-76 (elucidating attribution test), with, e.g., Howard v. Everex Sys., Inc., 228 F.3d 1057, 1061 n. 5 (9th Cir.2000) (elucidating substantial participation test). I agree with the majority that this case does not present a suitable occasion to choose between these competing tests. My concern, however, is that the majority’s “implied making” theory of liability captures a much broader range of conduct than either of the existing tests.
There is no need for me to wax longilo-quent. This is one of those occasions when the language and structure of a rule and the teachings of the Supreme Court coalesce to signal a particular result. Instead of heeding this signal, the majority prefers to rewrite Rule 10b-5 to achieve a different result. That rewriting is beyond the court’s legitimate authority. Moreover, the majority’s result, I fear, has the potential to cause a great deal of mischief. At the very least, the majority opinion will garble the law and cause confusion in an industry much in need of clarity.
Because the SEC’s complaint fails to state a claim under Rule 10b-5(b) upon which relief can be granted against these defendants, I would affirm the district court’s dismissal of that count. To the extent that the majority holds to the contrary, I respectfully dissent.

. The majority correctly acknowledges that Rule 10b-5 cannot be read to sweep more broadly than the statute to which it is appurtenant. Ante at 131-32. It then turns this axiom inside out and uses the broad language of the statute to define the obviously narrower *151 language of the rule. Ante at 131-32. I do not find either this sleight of hand or the majority’s circular attempt to explain it, ante at 132 n. 34, persuasive.

. Although the SEC's complaint contains some vague allusions that Tambone and Hus-sey may somehow have participated in drafting the prospectuses, the SEC has focused its primary liability arguments under section 10(b) and Rule 10b-5(b) on the defendants’ use of the prospectuses. In accordance with our usual praxis, I deem abandoned arguments that have not been developed on appeal. United States v. Zannino, 895 F.2d 1, 17 (1st Cir.1990).

. To be sure, earlier cases, cited somewhat disingenuously by the SEC, take a less categorical view. See, e.g., Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir.1973). But these cases preceded the Supreme Court’s seminal decision in Central Bank and, thus, have no continuing vitality.

. Indeed, the majority notes both the relationship and the linguistic differences between section 17(a)(2) and Rule 10b-5(b) in discussing section 17(a)(2) liability. See ante at 127-28. There, the majority concedes that the scope of Rule 10b-5(b) is "more restrictive” than that of section 17(a)(2). Id. at 127. I fail to understand how the majority can rely on this distinction in adjudicating the dismissal of the section 17(a)(2) claim, but gloss over it in adjudicating the dismissal of the Rule 10b-5(b) claim. The majority's cursory attempt to explain this inconsistency, ante at 128 n. 30, simply does not hold water. Once the word "make” is construed to mean "implied making” through "use,” any principled distinction between "make” and "by means of” is irretrievably lost.

. In this respect, it is instructive to note that after Central Bank courts began to strike down aiding and abetting claims under Rule 10b-5 because "[i]t was difficult to understand how the SEC could bring an aiding and abetting claim under Rule 10b-5 if a private litigant [could] not.” Louis Loss & Joel Selig-man, Fundamentals of Securities Regulation 1329 (2004). Congress later enacted a different provision to allow the SEC to bring aiding and abetting actions. See id. at 1329 n. 37 (citing Sec. Ex. Act § 20(f)). Congress easily could have done the same in the Rule 10b-5 context, but it has not done so.

. I do not mean to suggest that persons in the defendants' positions could never be found primarily liable for a section 10(b) and Rule 10b-5 violation. As the Central Bank Court recognized, 511 U.S. at 191, 114 S.Ct. 1439, such a scenario is conceivable. But the allegations in this case, even if true, do not align with the requirements for primary liability-