### In re HASSEN IMPORTS PARTNERSHIP, Debtor.

No. 2:11–bk–42068–ER.

United States Bankruptcy Court, C.D. California, Los Angeles Division.

March 7, 2012.

Carol Chow, Christine M. Pajak, Marina Fineman, Michael S. Neumeister, Stutman Treister & Glatt, Los Angeles, CA, for Debtor.

Arnold M. Alvarez-Glasman, City of Industry, CA, for City of West Covina, CA.

Jordan A. Kroop, Phoenix, AZ, Stephen T. Owens, James H. Broderick, Jr., Los Angeles, CA, for the Secured Creditors.

## MEMORANDUM OF DECISION REGARDING SINGLE ASSET REAL ESTATE DETERMINATION

ERNEST M. ROBLES, Bankruptcy Judge.

The Court hereby decides the City of West Covina's and City of West Covina Community Development Commission's (jointly the "City") motion for a determination that the holdings of Hassen Imports Partnership (the "Debtor") constitute a "single asset real estate" as that term is defined by 11 U.S.C. § 101(51B).[1] *See* D.E. 54. In the motion, the City argued that Debtor's properties qualify as a single project because Debtor solely exists to acquire and lease the properties to related entities, namely, West Covina Motors ("WCM") and West Covina Ford ("WCF"), which allegedly utilize the properties in furtherance of a common scheme. In so arguing, the City seeks an order essentially finding that Debtor's project, as it relates to the ownership of the properties, is facilitating the dealership enterprise conducted by WCM and WCF.

Accordingly, the Court, having determining that the Debtor otherwise qualifies as a single asset real estate debtor, set the matter for an evidentiary hearing to determine whether the Debtor's properties constituted a "single project" under § 101(51B). The evidentiary hearings were held on November 17–18, 2011 and December 19, 2011. Upon concluding the hearings, the Court ordered the parties to file post-hearing briefs on or before January 31, 2012 summarizing the evidence admitted and setting forth the parties respective arguments. The Court took the matter under submission upon receiving the post-hearing briefs.

This case raises unique issues in the realm of single asset real estate jurisprudence. Ordinarily, a "single asset real estate" determination involves properties, such as apartment buildings, business parks, or hotels, that a debtor leases for use by tenants or undeveloped land slated for development as a single project. The instant case deviates from these prior cases because, although the Debtor developed and leases the properties for use by other entities, the properties are not contiguous, occupied by a single structure, or

---

**1.** All further statutory citations reference Title 11 of the United States Code unless otherwise noted.

subject to a single development scheme. Further, the lessees utilizing the properties are controlled by the Debtor's principal and operate several independent but interrelated businesses on the properties. Nonetheless, since neither the code nor congressional history limit the scope of "single project", the Court must determine whether non-contiguous properties may constitute a single project as a result of the lessees' use.

Accordingly, in this decision, the Court seeks to outline a functional methodology for addressing the "single project" evaluation. The Court also seeks to address the instance where, as here, a debtor allegedly facilitates several businesses operated by related entities on properties owned by the debtor. Further, the Court seeks to address the general question of whether non-contiguous properties should qualify as a single project.

For the reasons set forth *infra*, the Court DENIES the City's motion.

### Jurisdictional Statement

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and the general order of reference in this District. This matter is a core proceeding arising under 28 U.S.C. § 157 and does not implicate any rights exclusively within the authority of the Article III judiciary.

### Findings of Fact

Debtor's sole business consists of acquiring, developing and leasing real property. As of the petition date, Debtor owned ten properties located in the cities of Covina and West Covina in the State of California. Debtor currently leases seven of these properties to entities associated with Debtor's president, Ziad Alhassen; namely, WCM and WCF.

*Corporate Structure of Debtor and Related Entities*

Debtor is a limited partnership organized under the laws of the State of California. Debtor is owned by two partners in unequal parts. Hassen Imports, Inc. ("HII") operates Debtor as general partner and holds a one-percent interest in the Debtor. HII, in turn, is owned by Hassen Holding Company ("HHC")—a corporate holding company that owns several entities related to the Debtor, including South Hills Lumber & Building Materials ("SHLBM"), a former tenant of Debtor, via its ownership of Hassen Real Estate Services ("HRES"). Ziad Alhassen controls HHC as president and shares ownership in equal parts with his brothers, Tarek Alhassen and Mohammed Tarif Alhassen.

Dighton America, Inc. ("Dighton") serves as Debtor's limited partner and holds a ninety-nine percent interest in Debtor. Dighton is wholly-owned by Emanon Limited. The precise ownership of Emanon Limited is unknown.

Debtor's primary lessees, WCM and WCF, are owned by West Covina Automotive Holdings ("WCAH")—an entity wholly-owned by Debtor's president Ziad Alhassen. WCM operates on several of Debtor's properties under the trade names Clippinger Chevrolet, Clippinger Chrysler, Jeep and Dodge, Clippinger Collision Center, and Clippinger Truck Equipment. WCF operates on one of Debtor's properties under the trade name Clippinger Ford.

*Debtor's Holdings and Operations*

Debtor began operations in or about 1998 following a prior bankruptcy in this Court.[2] Under the plan in the prior bankruptcy, Debtor obtained a loan from Chrysler Financial Corporation (predeces-

---

**2.** *In re Hassen Imports Partnership,* Case No. 2:98–bk–24281–ER.

sor to CorePointe Capital Finance, LLC ("CorePointe"))[3] to acquire and develop real property to use as car dealerships.[4] In 1998, Debtor acquired properties located at 1900 East Garvey Avenue South, West Covina, California and 1932 East Garvey Avenue South, West Covina, California.

Contemporaneously with Debtor's acquisition of the West Covina properties, WCM and WCF acquired the inventory and rights to operate Clippinger Chevrolet and Clippinger Ford from the Clippinger family. WCM and WCF also entered into lease agreements with, *inter alia,* the Clippinger family for properties that the dealerships utilized, including: 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; 141 West Geneva Place, Covina, California; and 129–137 West Orange Street, Covina, California.

In 2003 and 2004, Debtor expanded its holdings by acquiring 298 North Azusa Avenue, West Covina, California; 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; 141 West Geneva Place, Covina, California; 129–137 West Orange Street, Covina, California; and 401 North Citrus Avenue, Covina, California. Debtor acquired the properties located at 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; and 141 West Geneva Place, Covina, California from the Clippinger family via N & EC, LLP by exercising purchase options granted in or about 1999 when WCM and WCF acquired the rights to the Clippinger dealerships. The Debtor acquired the properties located at 129–137 West Orange Street, Covina, California and 401 North Citrus Avenue, Covina, California from IMI Real Estate, an unrelated real estate holding company.

Following the acquisition of 298 North Azusa Avenue, West Covina, California (the "Dodge Property") in 2003, Debtor leased the property to WCM, which continued the operation of an existing Chrysler, Jeep and Dodge dealership under the Clippinger trade name.

WCM and WCF continued operating the Clippinger Chevrolet and Ford dealerships in Covina until in or about 2006 when the dealerships were relocated to 1932 East Garvey Avenue South, West Covina, California (the "Chevy Property") and 2000 East Garvey Avenue South, West Covina, California (the "Ford Property"), respectively. The date Debtor acquired the Ford Property is unknown. Debtor failed to disclose the date of acquisition in its 7–day package and the issue was not addressed at the § 341(a) meeting or during the evidentiary hearing.

After relocating Clippinger Chevrolet to West Covina, WCM continued to lease the properties located at 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; and 141 West Geneva Place, Covina, California from the Debtor. WCM utilizes 137 West San Bernardino Road, Covina, California (the "Fabrication Shop Property") to operate Clippinger Truck Equipment and 141 West Geneva Place, Covina, California (the "Collision Center Property") to operate Clippinger Collision Center.

---

**3.** The Court shall hereinafter refer to CorePointe and its predecessor(s) in interest as "CorePointe".

**4.** *In re Hassen Imports Partnership,* Case No. 2:98–bk–24281–ER, D.E. 102, Debtor's Plan of Reorganization.

WCM also operated Clippinger (or West Covina) Hummer on property owned and leased to WCM by Debtor located at 1900 East Garvey Avenue South, West Covina, California ("Hummer Property"). WCM ceased operations of the Hummer Property when General Motors discontinued the Hummer product line in or about 2009.

### CorePointe Loans and Secured Interests

Debtor and CorePointe have entered into six loan transactions between 1999 and 2006. On June 22, 1999, CorePointe loaned Debtor $6,500,000 in accordance with the plan in Debtor's prior bankruptcy. These funds were used, *inter alia*, to purchase and develop certain properties for use as car dealerships.

Debtor and CorePointe then entered into four transactions between 2001 and 2004 for a total of $13,387,000. The parties failed to identify how Debtor used these funds. However, the evidence indicates that Debtor used these funds to finance the acquisition of at least some of the properties located in Covina and to develop some of Debtor's properties.

Debtor and CorePointe entered into one final transaction in 2006. In 2006, CorePointe loaned Debtor $5,000,000. The Deed of Trust associated with the loan states that all of the loans from CorePointe between 1999 and 2006, totaling $24,887,000, are secured upon seven of Debtor's properties—namely, the Ford Property, the Chevy Property (which includes 1919, 1923, 1935, 1941 and 1945 Norma Street, West Covina, California), the Hummer Property, the Dodge Property, the Fabrication Shop Property, 155 East San Bernardino Road, Covina (the "Former Employee Parking Lot"), and 777 East Edna Place, Covina ("Lot 5"). 129–137 W. Orange St., Covina and 401 N.

Citrus, Covina are presently unencumbered. It is uncertain whether the Collision Center Property is presently encumbered.

### Involvement of the City

The City became involved with the Debtor's operations as the result of negotiations between the Debtor, WCM and WCF, through Ziad Alhassen, and the City for a loan in exchange for a guarantee of certain tax revenue from the sale of vehicles from the West Covina dealerships.[5] Ultimately, the dealerships failed to generate the minimum tax revenues required by Debtor's agreement with the City. The breach resulted in a judgment for the City for approximately $7,586,603.14, which is secured by third priority liens on the Ford Property and the Chevy Property.

### Present Use of Debtor's Properties

At present, Debtor owns real property located at 1900 East Garvey Avenue South, West Covina, California; 1932 East Garvey Avenue South, West Covina, California; 2000 East Garvey Avenue South, West Covina, California; 298 North Azusa Avenue, West Covina, California; 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; 141 West Geneva Place, Covina, California; 129–137 West Orange Street, Covina, California; and 401 North Citrus Avenue, Covina, California.

Debtor currently leases the following properties to WCM: 1932 East Garvey Avenue South, West Covina, California; 137 West San Bernardino Road, Covina, California; 155 East San Bernardino Road, Covina, California; 777 East Edna Place, Covina, California; and 141 West Geneva Place, Covina, California. Debtor presently leases 2000 East Garvey Avenue

---

5. The underlying agreement is titled the Second Amended and Restated Disposition, Development and Owner Participation Agreement.

South, West Covina, California to WCF. The remaining properties are not presently leased.

The Chevy Property, located at 1932 East Garvey Avenue South, West Covina, is leased to WCM pursuant to a written lease. The lease requires WCM to pay Debtor $56,500 per month for use of the Chevy Property. The lease terminates on April 30, 2013 unless WCM opts to extend the term.

The Ford Property, located at 2000 East Garvey Avenue South, West Covina, is leased to WCF pursuant to a written amendment to a prior oral agreement. The lease requires WCF to pay Debtor $30,123 per month for use of the Ford Property.

The evidence presented regarding the use of the Chevy Property and Ford Property is minimal. The Chevy Property is used in the operation of Clippinger Chevrolet and houses a showroom, offices, parts department, and service facilities. The Chevy Property also contains room for the storage of vehicles. Despite the terms of the lease and WCM's continued use of the Chevy Property, Norma Hodges testified that WCM has not issued a check for rent for use of the Chevy Property since in or about 2008. Ziad Alhassen avers that the rent on the property is current.

Similarly, the Ford Property is used in the operation of Clippinger Ford and houses a showroom, offices, parts department, and service facilities. The Ford Property also contains room for the storage of vehicles. And, despite the terms of the lease and WCF's continued use of the Ford Property, Norma Hodges testified that WCF has not issued a check for rent for use of the Ford Property since in or about 2008. Ziad Alhassen avers that the rent on the property is current.

The Hummer Property, located at 1900 East Garvey Avenue South, West Covina, is currently unused and not leased to any entity. The Hummer Property was previously used by WCM subject to an oral lease agreement with Debtor to display, sell, and service Hummer vehicles. The lease with WCM terminated in or about 2009 when General Motors discontinued the Hummer product line and WCM ceased operations on the Hummer Property. Presently, several vehicles apparently owned by WCF and customized by Clippinger Truck Equipment are displayed on the Hummer Property. Ziad Alhassen stated that the vehicles are displayed to deter vandalism and maintain the appearance of occupancy for the benefit of the auto mall in which the Hummer Property is located. Despite efforts to locate a new occupant for the Hummer Property, Debtor has been unable to lease the property since the termination of the WCM lease.

The Dodge Property, located at 298 North Azusa Avenue, West Covina, is leased to WCM pursuant to an oral agreement. The terms of the lease provide for a monthly rent of approximately $35,000 with an unknown duration. The Dodge Property is used in the operation of Clippinger Chrysler, Jeep and Dodge and houses a showroom, offices, parts department, and service facilities. It also provides room for the storage of vehicles. The Dodge dealership does not store or display vehicles on any other property owned by Debtor. However, part of the parts inventory of the Dodge dealership is maintained at 181 West Geneva Place, Covina (the "Parts Warehouse"). The inventory in the Parts Warehouse consists of sheet metal used in the repair of vehicles. WCM used to sell these items to third-parties. When WCM ceased operations of the parts distribution business, the parts were placed in the Dodge inventory. Despite the terms of the lease and WCM's

continued use of the property, Norma Hodges testified that WCM has not issued a check for rent for use of the Dodge Property since in or about 2008. Ziad Alhassen avers that the rent on the property is current.

The Fabrication Shop Property, located at 137 West San Bernardino Road, Covina, is currently leased to WCM pursuant to an oral lease agreement on a month-to-month basis. WCM presently pays a composite rent for the Fabrication Shop Property as well as Lot 5 and the Collision Center Property (jointly referred to in the evidence as the "Covina Properties") in the amount of $17,636.32 per month. From approximately 1999 to 2005, WCM used the Fabrication Shop Property as a Chevrolet dealership and offices for its personnel. After the Chevrolet dealership relocated to West Covina, WCM continued to use the property for Clippinger Truck Equipment ("CTE") and to house some employees.

CTE makes structural and mechanical additions and augmentations to stock vehicles and trailers to better equip the vehicle for a specific use. The process is commonly known as "up-fitting." CTE up-fits various makes and models of trucks, including Chevrolet, Ford, International, and Kenworth. CTE does not up-fit Chrysler, Jeep or Dodge vehicles and does not conduct business with or through Clippinger Chrysler, Jeep and Dodge. CTE acquires the truck necessary to fill a specific customer order from the associated distributor, augments the trucks, and sells the vehicle through WCM or WCF. CTE will occasionally acquire trucks from WCM or WCF when the customer desires a Chevrolet or Ford truck; however, CTE also purchases Chevrolet and Ford trucks through other dealers when WCM or WCF cannot fulfill CTE's order. CTE occasionally utilizes the service of the Clippinger Collision Center to paint portions of the trucks added during the up-fitting process. Despite WCM's continued use of the property, Norma Hodges testified that she has not issued a check for rental of the Covina Properties since in or about 2008. Ziad Alhassen avers that the rent on the Covina Properties is current.

The Collision Center Property, located at 141 West Geneva Place, Covina, is currently leased to WCM pursuant to an oral lease on a month-to-month basis. 141 West Geneva Place is a composite of three parcels of real property—141, 163 and 181 West Geneva Place. 141 West Geneva house the repair facility. 163 West Geneva is a parking lot use to store cars while the vehicle is awaiting repairs. 181 West Geneva is a parts warehouse that contains parts and sheet metal used in the repair process. The Collision Center was previously operated by the Clippinger family in connection with the Clippinger Chevrolet dealership before WCM acquired the rights to Clippinger Chevrolet.

The Collision Center repairs damage to vehicles by replacing or repairing body panels or mechanical components. The Collision Center repairs all makes and models of vehicles. The business conducted by the Collision Center is comprised of internal business—i.e. business attributable to WCM or WCF—and external business—i.e. business from third-parties. Internal business ranges between 12.6% and 32.8% of the Collision Center's overall business in a given year. In conducting repairs, the Collision Center orders necessary parts for the vehicle from the respective dealership. For example, the Collision Center orders Ford parts from a Ford dealership, Toyota parts from a Toyota dealership, and BMW parts from a BMW dealership. The Collision Center maintains a small inventory of parts and sheet metal used in the repair of vehicles in the

Parts Warehouse. If the vehicle is a Chevrolet, Ford, Chrysler, Jeep or Dodge vehicle, the Collision Center orders the necessary part from a WCM or WCF dealership. Upon delivery, the Collision Center purchases the part from the WCM or WCF dealership's inventory.

The Former Employee Parking Lot, located at 155 East San Bernardino Road, Covina, is not currently leased. WCM utilized the property as an employee parking lot before WCM relocated the Chevrolet dealership to the Chevy Property in West Covina. WCM has not used the property since in or about 2002.

Lot 5, located at 777 E. Edna Place, Covina, is currently leased to WCM pursuant to an oral lease agreement on a month-to-month basis. WCM utilized the property to store vehicles until WCM relocated the Chevrolet dealership to West Covina. The building located on Lot 5 was utilized by SHLBM as a furniture manufacturing and wood-working shop. SHLBM no longer operates the facility located on Lot 5. Presently, Lot 5 is used to store heavy-equipment and construction related equipment and materials owned by an entity associated with HHC, and to store a small number damaged vehicles. WCM and WCF do not store or display salable vehicles on the property. However, WCM and WCF advertise the Clippinger dealerships via a modest sign on the perimeter fence.

The properties located at 129–137 West Orange Street, Covina are not presently leased. The properties were used before WCF relocated the Clippinger Ford dealership to West Covina to store vehicles.

Since the relocation, the properties are vacant and unused.

The property located at 401 North Citrus, Covina (the "Gas Station Property") consists of a non-operational gas and service station. Since acquiring the Gas Station Property, Debtor has not used or leased the property. Further, WCM and WCF have not used the property to store or display vehicles, or repair any vehicle in the service station on the property. The property is only used once a year by the City of Covina during an automotive festival as a temporary emergency response staging area. In 2010, the City of Covina condemned the buildings located on the property because they no longer met the minimum requirements under the City of Covina's building code.

Each property owned by Debtor shares a common insurance policy known as a garage policy.[6] Until November 2011, the properties were insured through a common policy issued by Universal Underwriters Insurance Company. The Debtor obtained a similar policy after the expiration of the Universal policy through Sentry Insurance. These policies were selected by the Debtor as the most cost-effective and comprehensive coverage for the properties. The deductible for the insurance policies are paid by WCM and WCF *pro rata* pursuant to their respective lease agreements.[7] Such payments included the deductibles attributable to properties not used by or leased to the dealerships.

*Development Plans for Covina Properties*

Starting in 2000, Debtor proposed a series of redevelopment plans affecting the

---

**6.** Garage policies are generally issued to automotive businesses and cover financial loss and liability.

**7.** During the evidentiary hearing, Ziad Alhassen was questioned regarding the nature of the WCM and WCF leases. Mr. Alhassen testified that the leases were likely "triple-net" leases that required the lessee to pay certain expenses, including insurance, taxes and utilities. However, Mr. Alhassen was uncertain whether the leases were in fact "triple-net" leases.

properties located in the City of Covina. These discussions continued through at least 2008 and involved the preparation and submission of redevelopment plans to the City of Covina and the execution of several exclusive negotiations agreements between Debtor and the City of Covina. Although these agreements did not progress to actual development of the Covina properties, the negotiations were ongoing and "serious" in 2008, according to then City Manager of the City of Covina, Paul Philips.

### Summary of the Arguments

The City contends that the Properties constitute a single project because Debtor operates solely to acquire, develop and lease the Properties to WCM and WCF for use in support of the dealerships. The City asserts that the ownership, use, financing and development of the Properties evidence the singularity of Debtor's scheme.

There is no dispute with regard to ownership. Debtor owns each of the ten properties at issue. The City, however, argues that the control of the Properties, in addition to ownership, also indicates that the Properties operate as a single project. The City contends that "[a]s President of the Debtor's general partner, Mr. Alhassen is in charge of the financing and business operations and is 'involved with all major decisions made by the Debtor.'" D.E. 271, at p. 7. The City further argues that "[t]he evidence shows that under Mr. Alhassen's guidance, the Debtor's only activities since at least 1999 have been: (1) to acquire and develop properties suitable for use as car dealerships and dealership support facilities; (2) to lease those properties exclusively to WCM and/or WCF; and (3) to use those properties to facilitate the operations of the Clippinger automobile franchise." *Id.* at pp. 7–8.

In support of the common scheme of acquisition posited by the City, it argues that, since Debtor's genesis pursuant to a 1998 plan of reorganization in Debtor's prior bankruptcy, Debtor's sole purpose has been the acquisition of real property for development and use as dealerships and dealership support properties by WCM and WCF. "Specifically, the 1998 Plan governed the development and lease of the Debtor's dealership properties at 1900–2000 East Garvey Avenue South, West Covina, and called for the $6.5 million to be 'used to expand the Dodge Dealership and to construct two new dealership facilities' on the Debtor's properties." , *Id.* at p. 8. Debtor still owns these properties; thus, as the City contends, evidencing that these properties were the foundation of Debtor's dealership scheme.

The City further argues that the remaining properties were acquired and are used as dealerships or in support thereof. *Id.* at pp. 8–13. It is uncontested that the Ford Property, Chevy Property, and Dodge Property are used as operating dealerships. The City argues that the Hummer Property is used by WCF to display vehicles and WCM as a point of ingress and egress for vehicles utilizing the service facilities on the Chevy Property. *Id.* at p. 9. Further, the City contends that "[t]he evidence demonstrates that each of the Non–Dealership Properties is (or was recently) leased to and/or used by the Debtor-affiliated dealerships to support the daily operations of the Clippinger franchise." *Ibid.*

With regard to the Fabrication Shop Property, the City argues that "[t]he Debtor acquired this property in 2004 to support the Clippinger dealerships." *Ibid.* The City contends that "Ziad Alhassen described it as 'essential to support the successful operations and growth of all of [the Debtor-affiliated] dealerships' and

stated that it would be used to 'continue its sales, service and Parts for the Chevrolet ... operation." *Ibid.* The City states that the Debtor concedes that "[t]his property is currently leased to WCM for use as: (1) a vehicle storage lot for medium-duty and heavy-duty trucks owned by WCM and WCF; and (2) a fabrication shop to provide custom alterations to vehicles owned by WCM and WCF. Moreover, this property serves as the office for WCM's human resources director, Maureen Rooks." *Id.* at p. 10 (citations omitted).

With regard to the Collision Center Property, the City argues that "[t]he Debtor also acquired this property in 2004 to serve a vital role in supporting the Clippinger dealerships." *Ibid.* The City contends that "[t]he Debtor concedes that this property is currently used to support the operations of the Clippinger franchise." *Ibid.* Specifically, "this property is currently leased to WCM, which operates the 'Clippinger Collision Center', an auto body repair shop on the premises...." *Ibid.* The City contends that the property supports the dealership enterprise by: (1) storing parts within the inventory of Clippinger Chrysler, Jeep and Dodge, (2) ordering parts from the dealerships, (3) repairing vehicles damaged prior to delivery or while on a dealership lot, (4) generating business from the Fabrication Shop, (5) generating business from other "internal" sources, and (6) repairing vehicles purchased from the dealerships. *Id.* at pp. 10–12.

With regard to Lot 5, the City argues that "[t]he Debtor also acquired this property in 2004 to serve support [*sic*] the Clippinger dealerships." *Id.* at p. 12. The City states that "[p]rior to acquiring the property, Ziad Alhassen described it as 'essential to support the successful operations and growth of all of [the Debtor-affiliated] dealerships' and stated that it is 'heavily utilized to store vehicles for the franchise....' " *Ibid.* The City contends that WCM currently leases the property and continues to use the property for vehicle storage. *Ibid.*

With regard to the Former Employee Parking Lot, the City argues that the property was acquired in 2004 to support dealership activities by providing parking for employees. *Ibid.* The City further contends that the property serves the dealership scheme because it is leased to WCM and located near other WCM operations. *Id.* at pp. 12–13. The City has not elaborated on how the proximity of the Former Employee Parking Lot to other properties supports the alleged dealership enterprise.

With regard to 129–137 W. Orange St., the Debtor acquired the property in 2004. The City contends that "[u]ntil very recently, this property was leased to WCF and used by WCF for vehicle storage and parking." *Id.* at p. 13. And, "[a]ccording to the Debtor, the property has only been vacant since 2010." *Ibid.*

With regard to 401 N. Citrus Ave., the City contends that the property, which the Debtor acquired in 2004, has been used since its acquisition as a vehicle storage lot. *Ibid.* The City's allegation is based upon aerial photographs taken in 2005.[8] *Ibid.* The City further contends that, to the extent 129–137 W. Orange St. and 401

---

**8.** During the evidentiary hearing, the City and Debtor presented a myriad aerial photographs and the testimony of an officer of the photography company. The City offered photographs from 2005 in an attempt to support its position that the Covina properties are used as storage lots for WCM and WCF vehicles. The Debtor offered later aerial photographs of the same properties to rebut the City's contention. The Court declined to admit the images for anything more than demonstrating the physical proximity of the Properties and to impeach Mr. Alhassen regarding the use of certain properties in 2005.

N. Citrus Ave. are unused, such non-use is *de minimis* in light of Debtor's total holdings and a result of Debtor's loss of unlimited financing for the acquisition of vehicle. In other words, the City argues that Debtor still intends to use all the properties in support of the car dealership project but WCM and WCF cannot acquire the requisite number a vehicles to necessitate the use of storage lots in Covina. *Id.* at pp. 23–24.

The City further contends that the interconnectedness between Debtor, WCM and WCF evidences the single project. Specifically, the City argues that the Debtor, WCM and WCF act as a single entity under the direction of their president Ziad Alhassen. The City avers that the interconnectivity is demonstrated by the fact that: (1) WCM and WCF have not, according to Norma Hodges, paid rent since at least November 2010; (2) the Debtor insures the Properties under a single garage insurance policy, which is specifically designed to insure properties used for automotive-related businesses and which was, presumably, obtained by an employee of either WCM or WCF; [9] and (3) WCM and WCF pay the property taxes and utilities for all the Properties, even those not leased to either entity or ostensibly used by either entity. *See Id.* at pp. 13–21.

The City further argues that CorePointe considered the Properties a single project—thus, as the City contends, demonstrating that the Properties operate under a common scheme. Specifically, as the City avers, "not only does the October 2006 Deed of Trust recite that it secures repayment of a $5 million loan from Chrysler Financial [(now CorePointe)] to the Debtor, but it also secures '[p]ayment of all other loans' made by Chrysler Finan-

cial to the Debtor-affiliated dealerships, including wholesale floorplan loans used by the dealerships to purchase their automotive inventory." *Id.* at pp. 17–18 (emphasis omitted), *citing* Ex. 36.

Finally, the City preemptively discounts the development plans discussed during the hearing. Specifically, the City argues that "[c]ase law is clear that speculative, unrealized, future plans for development cannot be used to avoid a determination that a debtor's properties constitute a 'single project.'" *Id.* at p. 21. The City contends that "[o]ther than Mr. Alhassen's testimony regarding the unrealized intentions of the Debtor, Debtor presents absolutely no admissible documentary evidence demonstrating that it had any feasible plans for the development of any of the Non–Dealership Properties in the City of Covina or the Dealership Properties in the City of West Covina." *Id.* at p. 22. The City relies on the testimony of Debtor's appraiser Ronald Buss for the proposition that, other than the proposals submitted to the City of Covina in 2000 and 2008, the Debtor has nothing but "pie-in-the-sky" development plans.

On the other hand, the Debtor contends that the Properties are not a single project and that the City has failed to carry its burden of proof as the moving party. Specifically, in refuting the aerial photographs submitted by the City, the Debtor avers that the images are immaterial because they were captured six years before the petition date and cannot identify whether vehicles depicted on the Properties are owned by Debtor, WCM or WCF. D.E. 272, at pp. 5–6. Further, with regard to the common garage policy, Debtor avers that the fact Debtor insured all the Properties

---

**9.** The presumption is supported by the fact that Debtor does not have any employees oth- er than its principal Ziad Alhassen.

under a single policy does not in any way demonstrate how the Properties were used. *Id.* at pp. 6–7. And, although the nature of the policy suggests that the Properties are all used for an automotive purpose, the characterizations of the Properties in the policy does not affirmatively establish how the Properties are use. *Id.* at p. 7.

The Debtor also attacks the City's arguments regarding financing. Specifically, the Debtor states that the CorePointe loan is not secured on all the Properties. *Ibid.* The Debtor further argues that the liens on the Properties fail to illuminate how the properties are used. *Ibid.* Also, with regard to Ziad Alhassen's statements to CorePointe's predecessor regarding the necessity to acquire some of the Covina Properties, the Debtor states that the letter was posted nearly eight years before the petition date and before WCM and WCF relocated the dealerships to the West Covina properties. *Id.* at pp. 7–8. The Debtor also argues that the letter was admitted solely for impeachment purposes and not to prove the truth of the matters asserted therein. *Id.* at p. 8.

The Debtor also challenges the argument that leasing most of the Properties to WCM and WCF establishes a single project. *Id.* at p. 9. The Debtor contends that the leasing argument is a waste to time because "the Court has held that such a finding would not be relevant. . . ." *Ibid.* Debtor concedes, and, indeed, has never disputed, that the majority of the Properties are leased to WCM and WCF. *Ibid.* However, Debtor contends that 401 N. Citrus Ave., 129–137 W. Orange St., and the Former Employee Parking Lot were not leased as of or immediately before the petition date. *Ibid.*

Further, with regard to the *de minimis* argument proposed by the City, the Debtor contends that the City has failed to cite any precedent establishing a *de minimis* exception to the single project singularity requirement. *Id.* at pp. 10–12. The Debtor further contends that the City tacitly concedes the insufficiency of its evidence regarding the use of all Properties in a common scheme by asserting the *de minimis* argument. *Ibid.*

The Debtor then claims that the evidence presented demonstrates that the Properties are not a single project. Specifically, Debtor contends that the City's position fails with 401 N. Citrus. *Id.* at p. 13. The Debtor states that 401 N. Citrus Ave. is unencumbered, not leased, unused, and, ultimately, unrelated to the dealership operations. *Ibid.* The Debtor relies on aerial images taken after the relocation of the Ford and Chevy dealerships to West Covina [10] and the testimony of Norma Hodges and Flint McClain for the fact that the former gas station has been condemned and unused for some time before the petition date. *Id.* at p. 14.

Similarly, Debtor states that 129–137 W. Orange St. is unencumbered, not leased, unused, and unrelated to the dealership operations. *Id.* at p. 15. Debtor also contends that the Former Employee Parking Lot has been vacant for years and was not used as of the petition date. Debtor alleges that "[a]lthough this Property has been used by employees of WCM to park their cars, this practice ended when the Dealerships moved to West Covina. Specifically, Ms. Hodges . . . testified that no 'business activity' has taken place on the Former Employee Parking Lot since 2002." *Id.* at p. 16.

**10.** As previously noted, the photographs were not admitted to evidence the use of the Prop-erties.

Regarding the Dodge Property, Debtor avers that it is not part of any dealership project because it is not located in the West Covina Auto Plaza and has no operational ties to any other Property than minimal interactions with the Clippinger Collision Center. *Id.* at p. 18. Essentially, the Debtor avers that the Dodge Property is self-sufficient. *Id.* at pp. 18–20.

The Debtor next argues that, although the Collision Center Property is leased to and operated by WCM, the Collision Center is not dependent on the dealerships or WCM's other businesses for its operations. *Id.* at p. 22. Specifically, the Debtor states that at least two-thirds of the Collision Center's business is derived from sources other than the dealerships in any given year. *Id.* at p. 20. The Debtor further contends that the Collision Center has no ties to other Covina Properties. *Id.* at 20–21.

With regard to Lot 5, the Debtor argues that the Property has not and does not exclusively serve the dealership project. Specifically, "[a]lthough partially leased to WCM, this Property is also leased to two other entities that are entirely unrelated to either the Dealerships or the Debtor's other Properties: (a) [Hassen Development Corporation] and (b) South Hills [(i.e. SHLBM)]." *Id.* at p. 23. The Debtor further contends that "[t]he most recent photograph of the Edna Property contained in the 2010 Appraisal shows a limited number of 'junk cars' on the Edna Property and heavy construction material.... None of the vehicles pictured belong to the Dealership." *Id.* at pp. 23 –24.

Lastly, with regard to the Fabrication Shop Property, the Debtor concedes that the property is leased to WCM and that Clippinger Truck Equipment supports Clippinger Ford and Clippinger Chevrolet by customizing Ford and Chevrolet vehicles. *Id.* at p. 24. Notwithstanding, the Debtor avers that CTE and the Fabrication Shop Property does not and has never utilized 401 N. Citrus Ave., 129–137 W. Orange St., the Dodge Property, or the Former Employee Parking Lot. *Id.* at pp. 24–25.

### Analysis

■■■ When determining whether a debtor's holdings constitute a single property or project, the Court must look to the plain language of the statute. *See Meruelo Maddux Properties–760 S. Hill Street, LLC, et al. v. Bank of America, N.A. (In re Meruelo Maddux Properties, Inc.),* No. 10–56128, 2012 WL 248167, at *2 (9th Cir. 2012), *citing United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). " 'Where the statute's language is plain, the sole function of the courts is to enforce it according to its terms, for courts must presume that a legislature says in a statute what it means and means in a statute what it says there.' " *Ibid, quoting Int'l Ass'n of Machinists & Aerospace Workers v. BF Goodrich Aerospace Aerostructures Grp.,* 387 F.3d 1046, 1051 (9th Cir.2004).

■■■ Under the Bankruptcy Code, the term single asset real estate is defined as:

real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

11 U.S.C. § 101(51B). Accordingly, § 101(51B) requires a debtor to meet four qualification: (1) the real property or properties constitute a "single property or project," other than residential property with fewer than four residential units; (2)

the real property or properties generate substantially all of the income of the debtor; (3) the debtor is not a family farmer; and (4) the debtor does not utilize the property or properties for any substantial business operation. *See In re Webb Mtn, LLC,* 2008 WL 656271, 2008 Bankr.LEXIS 691 (Bankr.E.D.Tenn. Mar. 6, 2008); *see also In re The McGreals,* 201 B.R. 736, 741 (Bankr.E.D.Penn.1996) (the elements enumerated in *McGreals* includes the $4,000,000 cap set forth in the prior manifestation of § 101(51B)). "In deciding whether property constitutes 'single asset real estate,' the Court must look to current facts, not to those existing in the past, nor to Debtor's aborted plans for the future." *In re Charterhouse Boise Downtown Props., LLC.,* 2008 WL 4735264, at *1–2, 2008 Bankr.LEXIS 4213, at *4 (Bankr.D.Idaho Oct. 24, 2008).

■ The City, as movant, bears the burden of demonstrating that the properties constitute a single project. *See In re Meeks,* 349 B.R. 19, 21 (Bankr.E.D.Cal. 2006) (a "moving party . . . carries the burden of proof on all factors."); *see In re Charterhouse,* 2008 WL 4735264, at *1–2, 2008 Bankr.LEXIS 4213, at *4; *see also In re Pac. Gas & Elec. Co.,* 2001 Bankr.LEXIS 2195, at *20 n. 10 (Bankr. N.D.Cal. July 26, 2001).[11]

It is undisputed, and, thus, the Court hereby finds, that the Debtor is not a family farmer, generates substantially all of its income from the Properties, and does not conduct any business on the Properties other than that incidental to ownership. Further, it is undisputed that Debtor owns multiple commercial properties and, thus, the Properties cannot be classified as a "single property" under § 101(51B). Accordingly, the Court must determine whether the Properties constitute a single project.

■ Determining whether certain properties constitute a single project is a factual inquiry. "[I]n order for two or more separate properties to constitute a single project within the meaning of Code §§ [*sic*] 101(51B), the properties must be linked together in some fashion in a common plan or scheme involving their use. The mere fact of common ownership, or even a common border, will not suffice." *In re The McGreals,* 201 B.R. 736, 742–743 (Bankr.E.D.Penn.1996). The "common plan or scheme" must govern the present use of all the properties. *See In re Charterhouse Boise Downtown Props., LLC.,* 2008 WL 4735264, at *1–2, 2008 Bankr.LEXIS 4213, at *4 (Bankr.D.Idaho Oct. 24, 2008).

■ In evaluating a certain set of properties to determine if they constitute a single project, courts have considered a number of factors, including: (1) the use of the properties; (2) the circumstances surrounding the acquisition of the properties, including the time of the acquisition and the funds used to acquire the properties; (3) the location of the properties and proximity of the properties to one another; and (4) any plans for future development, sale or abandonment of the properties. *See In re The McGreals,* 201 B.R. 736 (considering, *inter alia,* the use of the properties, the acquisition of the properties and financing therefor, including the perspective of the lender of the development, the physical proximity of the properties and development plans); *In re Philmont Development,* 181 B.R. 220 (Bankr.E.D.Penn.1995) (considering, *inter alia,* the use of the properties and the proximity of the prop-

11. Because the term "single asset real estate" only appears in § 362(d)(3), the provisions of § 362(g) further support the finding that Movant bears the burden of proving that the Properties are a single project.

erties); *In re Sargent Ranch LLC,* 2010 WL 3189714, 2010 Bankr.LEXIS 2607 (Bankr.S.D.Cal. Aug. 6, 2010) (considering the acquisition of the properties and financing therefor, and the development plans for the properties); *In re Webb Mtn, LLC,* 2008 WL 656271, 2008 Bankr.LEXIS 691 (considering, *inter alia,* the acquisition of the properties and the financing therefor, and the development plans for the properties). Use of the properties, however, is the *sine qua non* of a single project determination. *See In re The McGreals,* 201 B.R. at 742–743. Where the properties are not presently used together in a common scheme, a single project cannot exist and the remaining factors, which help determine whether commonly used properties constitute a single project under the code, become irrelevant.

▆ Based on the evidence presented, the Court finds that the City failed to prove that the Properties are jointly used as a single project. Essentially, the City contends that the properties operate as a single project because Debtor acquired and developed the properties solely to facilitate the operations of WCM and WCF. Thus, although courts generally limit the use inquiry to the debtor's use of the subject properties,[12] the Court must examine how WCM and WCF utilize the Properties to determine whether Debtor's single project consists of acquiring and developing real property for the sole benefit of WCM and WCF. *See In re Philmont Development Co.,* 181 B.R. 220 (the court declined to consider the holdings of

the limited partnerships and any joint enterprise); *see In re Meruelo Maddux Properties, Inc.,* No. 10–56128, 2012 WL 248167, at *2 (the court declined to consider the properties owned by other related co-debtors as a defense to a determination that the holdings of a single debtor constituted a single property); *compare In re The McGreals,* 201 B.R. 736 (the court considered the use of the debtors lessee in evaluating whether the properties constituted a single project).

▆ However, prior to evaluating the actual use of the Properties, the Court will address some of the City's secondary arguments. First, with regard to the leasing of the Properties, the Court finds that the leasing of the Properties is neither pertinent to the single project determination nor supportive of the City's position. As the *McGreals* Court noted, "The mere fact of common ownership, or even a common border, will not suffice." *In re The McGreals,* 201 B.R. 736, 742–743 (Bankr. E.D.Penn.1996). If mere ownership is insufficient, leasing certain properties to a single entity, or, as in this case, a small number of entities, fails to establish a single project without further evidence of common use.

Second, with regard to the insurance coverage, the Court finds insurance protection, in and of itself, unpersuasive. Simply put, this is not evidence of common use. Although the nature of the policy—i.e. a garage policy—demonstrates common protection of the Properties and indicates some common scheme, the City

---

**12.** The Court finds that inquiring into how tenants use a debtor's properties is generally impermissible. The Code applies to the Debtor, not the tenants, and, thus, the single project evaluation should be limited likewise. Further, evaluating how the tenants use a certain property may improperly impute the actions of a non-debtor entity to the debtor, which, under § 362(d)(3), may unfairly limit a

debtor's rights under the Code. Here, however, because of the ostensible interrelation between the Debtor and the tenants, and the City's argument, the Court must consider how WCM and WCF use the Properties as well as other factors to determine whether Debtor solely uses the Properties as a single project for the benefit of related entities.

must demonstrate a common plan or scheme involving the use of the Properties. *Ibid.* The insurance does not identify the use of the Properties beyond *pro forma* characterizations of the Properties in the policy. Further, the City failed to establish that the classifications of the Properties in the policy—e.g. vehicle storage—were based on representations made by the Debtor to the insurance broker or were merely default categorizations employed by the broker. Nonetheless, the Court shall consider the leasing arrangements for the Properties and insurance coverage in tandem with their present use.

Third, with regard to the ownership and control of the Properties, the Court declines to view Debtor, WCM and WCF as a single entity because of Ziad Alhassen's role as president in each entity. The evidence indicates that the Debtor is not related, in a corporate sense, to WCM and WCF. The Debtor does not hold any interest in WCM, WCF or WCAH. Further, were the Court to pierce the corporate veil and view WCM, WCF and Debtor as a single entity, the Court would deny the Motion on the grounds that Debtor was engaged in a substantial business on the Properties other than those incidental to ownership.

■ Fourth, with regard to the contention that some of the Properties lay vacant because WCM and WCF lost unlimited financing, the Court finds the argument unpersuasive. The precedent does not carve-out an exception for instances where a common scheme was ostensibly impeded by outside forces. The Properties must be involved in a common scheme or plan as of the petition date. *See In re Charterhouse Boise Downtown Props., LLC.,* 2008 WL 4735264, at \*1–2, 2008 Bankr.LEXIS 4213, at \*4 (Bankr.D.Idaho Oct. 24, 2008). Indeed, even assuming, *arguendo,* that the precedent created such an exception, the City has failed to produce sufficient evidence to support its contention.[13]

■ Finally, the Court finds the City's *de minimis* non-use argument unavailing. Although, the City failed to cite any precedent to support its position, the Court located one case that may be interpreted as supporting a *de minimis* exception—*In re Sargent Ranch, LLC,* 2010 WL 3189714, 2010 Bankr.LEXIS 2607. In *Sargent Ranch,* the court concluded that contiguous undeveloped land, which the debtor intended to develop as residential properties, constituted a single project despite the fact that several small portions of the properties were leased for use as cellular antenna towers. Specifically, the Court stated: "There is no disputing the fact that at the time the case was filed, as well as at the time of the hearing, every inch of the every parcel of the Property, with the exception of a small portion being leased to third parties, is part of the same operation—namely waiting and planning for future development." *Id.* at \*3, 2010 Bankr.LEXIS 2607, at \*7. Simply put, the court concluded that the development of some of the property as cellular antenna towers did not impede the debtor's project—i.e. the development of residential properties—and, thus, a single project may still exist despite the variance.

---

**13.** The aerial photography the City relies upon to prove that the Properties were used as vehicle storage was admitted for the sole purpose of demonstrating the geographic locations of the Properties. Notwithstanding, the photography demonstrates that after 2005, many of the Covina properties were vacant. Indeed, the photographs and testimony elicited during the evidentiary hearing fail to demonstrate that the vehicles seen on 401 N. Citrus in 2005 were owned by or related to WCM or WCF.

The Court respectfully disagrees and, furthermore, finds the *Sargent Ranch* case distinguishable. Section 101(51B) is explicitly clear—the Court must find that a "single property or project" exists. *See In re Meruelo Maddux Properties, Inc.,* No. 10–56128, 2012 WL 248167, at *2. Thus, the exclusion of any property from the common scheme precludes a finding that a single project exists. To find otherwise disregards the plain language of the statute.[14] Further, in this case, the non-use of some of the Properties precludes the finding that Debtor's "single project" consists of facilitating the dealership operations because some properties simply aren't used in accordance with the purported project. Further, to the extent *Sargent Ranch* established a *de minimis* exception to the "single project" provision, the Court disagrees with the *Sargent Ranch* Court's interpretation of § 101(51B) and, as non-binding, unpublished precedent, the Court disregards the same.

■■■ Now, with regard to the use of the Properties as of the petition date, the Court finds that the Properties do not function as a single project. As the Court previously stated, a series of properties may function as a single project without each property being essential to or dependent on every other property. Rather, the properties must function together in support of a common plan or scheme. *See In re The McGreals,* 201 B.R. at 742–743. Here, several properties are unused and those presently used by WCM and WCF operate as independent concerns.

First and foremost, the Court finds that the City has failed to establish that 129–137 W. Orange St. and 401 N. Citrus Ave. were used as of the petition date. The evidence presented establishes that these properties were unused for at least a year before Debtor filed for bankruptcy. Indeed, in the case of 401 N. Citrus, the only admissible evidence presented establishes that Debtor acquired the property for further development and has not utilized it since.

Further, the Court finds that Lot 5 and the Former Employee Parking Lot are not utilized in furtherance of the dealership scheme. Presently, neither WCM nor WCF utilize the properties for the storage or display of vehicles. To the extent vehicles are maintained on the properties, Debtor states that the vehicles do not belong to Debtor, WCM or WCF; rather, the vehicles are either junk cars or construction equipment owned by an entity related to Debtor. Indeed, as discussed *infra*, the testimony at the evidentiary hearing indicates that the unused Covina properties are presently held for future development.

The Court also finds that, although the Collision Center and Fabrication Shop are operated by WCM, they are not part of the dealership project. The Collision Center operates as an independent business merely owned by WCM. The Collision Center repairs all makes and models of cars and acquires parts necessary for a specific repair from the corresponding dealership. And, to the extent the Collision Center deals with the dealerships, these dealings carry all the indicia of an arms-length transaction between two unassociated entities. Specifically, if the Collision Center orders a part from a WCM or WCF dealership, the Collision Center purchases the part before using it to repair the vehicle. Similarly, if the Collision Center repairs a vehicle owned by the dealership, the ac-

---

**14.** The *McGreals* Court employed a plain language interpretation in finding that non-use of one of two properties as part of a common scheme prevented the conclusion that the properties were a single project. *In re The McGreals,* 201 B.R. 736.

count ledgers indicate that the Collision Center is compensated for the service as opposed to writing-off the work as an internal business expense.

Moreover, the bulk of the Collision Center's business is not derived from WCM or WCF. Specifically, the Collision Center derives more than 70% of it business in an average year from unrelated entities. The City argues that the statistics fail to account for the repair of vehicles purchased from WCM or WCF. The Court, however, finds these numbers immaterial. And, even if the statistics were material, the City failed to present any evidence establishing what percentage of the Collision Center's business is attributable to such customers. Further, the City's argument also assumes without substantiation that the individuals who purchase vehicles from WCM or WCF utilize the Collision Center because they were a customer of WCM or WCF. These hypothetical customers could choose the Collision Center for a myriad reason, including insurance company and police referrals, or simple convenience. In fact, Derald Nokes, manager of the Collision Center, testified that insurance company and police referrals generate a significant portion of the Collision Center's business.

Finally, the Collision Center only has one connection with any dealership—the storage of some parts in the Clippinger Chrysler, Jeep and Dodge inventory on a portion of the property. This connection, however, does not establish that all the Properties are used by the Debtor in a common scheme. Rather, it establishes a single link between two properties presently leased to and operated by WCM.

With regard to the Fabrication Shop, the Court finds that the business conduct-ed at the Fabrication Shop is related to WCM and WCF. However, that interrelatedness does not establish a single project. Rather, the Fabrication Shop operates as a part of WCM that serves a function independent of the dealership project. The Fabrication Shop customizes vehicles that it acquires from third-party dealerships, including Clippinger Chevrolet and Ford, and sells those vehicles to its customers using WCM's vehicles sales licenses. The City failed to demonstrate that the Fabrication Shop is dependent on the dealerships or contributed to the dealership project.[15] For instance, the City failed to demonstrate that the Fabrication Shop receives its orders through the dealerships, that the customers come to the shop through the dealership, that the dealerships advertise CTE's services, or that CTE purchases vehicles exclusively through the dealerships.

Ultimately, to the extent a single project appears to exist, the single project does not pertain to the actions of the Debtor or Debtor's ownership of the Properties. Rather, such indicia are attributable to the fact that WCM operates several properties as part of a common enterprise. However, even upon evaluating the actions of WCM, the Count finds that those properties leased to and operated by WCM lack the requisite interrelatedness to constitute a single project within the meaning of § 101(51B). The properties are utilized by WCM to operate four distinct, albeit related, operations—CTE, the Collision Center, Clippinger Chevrolet, and Clippinger Chrysler, Jeep and Dodge—not a single project.

With regards to the Debtor, the Court finds that it acquired and maintains the

---

**15.** The modification of vehicles at the request of WCM or WCF does not support the dealership project. Rather, it merely evidences a business relationship between the CTE and WCM or WCF as a client.

Properties for at least two distinct purposes. First, the Debtor purchased and developed certain property for use as car dealerships, including the Chevy Property, Ford Property, Dodge Property, and Hummer Property. These properties are uniquely outfitted for use as car dealerships. And, in the case of the Chevy Property, Ford Property, and Hummer Property, the properties are located in an auto mall—i.e. property specifically designated for development into car dealerships. However, even as to the dealership properties, the evidence presented falls short of showing that the Debtor developed these properties to exclusively benefit WCM and WCF or as a single project. Indeed, the Hummer Property is not presently leased to or used by WCM or WCF in any significant way. Further, Ziad Alhassen testified that Debtor has attempted to lease the property to other dealerships unassociated with WCM or WCF, *to wit,* a Fiat dealership.

Moreover, the Court finds that the dealership properties do not qualify as a project § 101(51B). Rather, the dealerships are distinct operations carried out by two separate entities. The similarities between the operations of the dealerships and control exercised by Ziad Alhassen over WCM and WCF do not affect the nature of the subject properties or the interrelatedness of their use, which is the essential inquiry. In short, although the properties are all used as dealerships, they are not jointly used as a single asset to support a single venture. They are individually used to support each distinct dealership.

The Debtor's other operation consists of acquiring and holding property for later development. As discussed more fully *supra,* the Debtor acquired the Covina properties after WCM and WCF began operating Clippinger Chevrolet and Ford in Covina. Ziad Alhassen testified that Debtor acquired the Covina properties for future development potential. The contention is supported by the 2000 development plan, prepared by Debtor before it acquired the properties, and 2008 development plan, which incorporate some or all of the Covina properties. The continued use of some of the Covina properties by WCM via month-to-month oral lease agreements does not alter this fact because the Debtor could terminate these leases before the consummation of any development plan.

Thus, based on the foregoing, the Court finds that the City failed to demonstrate that the Properties are used in a common plan or scheme. Further, because the City failed to do so, the remaining factors considered by prior courts are immaterial. Nonetheless, the Court shall consider these factors as they too fail to support the City's position.

▇▇▇▇▇ The circumstances surrounding the acquisition of the Properties demonstrate that the Properties were acquired at different times for different purposes. Generally, a court will consider the circumstances surrounding the acquisition of properties in a single project determination where the use of the properties is indeterminate because some or all of the properties are unused or undeveloped. *See, e.g., In re The McGreals,* 201 B.R. 736; *In re Webb Mtn, LLC,* 2008 WL 656271, 2008 Bankr.LEXIS 691; *In re Sargent Ranch, LLC,* 2010 WL 3189714, 2010 Bankr.LEXIS 2607; *In re Foote Development Company, Inc.,* 2007 WL 7216512, 2007 Bankr.LEXIS 4782. In so doing, courts presume that an acquisition was made to serve a single purpose if a debtor contemporaneously acquires the properties and funds the acquisition by granting liens on the properties. Courts will also consider whether the lender be-

lieved that the debtor sought to acquire the properties to serve a single project to support the presumption that a common scheme exists. *See In re Philmont Development Co.*, 181 B.R. at 224.

Here, the City contends, essentially, that all the Properties were acquired with funds from CorePointe for use in support of the dealership project and that CorePointe viewed the Properties as a single project. The City relies on a letter from Ziad Alhassen to CorePointe dated in 2003, the terms of the 2006 Deed of Trust, and the testimony of Kim Gage, CorePointe's counsel, to support its position. However, in sum, the evidence presented fails to support the City's position.

First, the Properties were not acquired at the same time. Rather, the Properties were acquired through a series of transactions between 1999 and 2004. Second, the Properties were not acquired to serve a single purpose. *See supra.* As Ziad Alhassen testified, Debtor acquired many of the Covina properties for their development potential. Indeed, as the City concedes, Debtor prepared and filed development plans in 2000 and 2008 that incorporated the Covina properties.

Further, the City's reliance on the letter is misplaced. First and foremost, the Court admitted the letter solely for impeachment—not for the truth of the matters therein asserted. Notwithstanding, the letter merely demonstrates that Ziad Alhassen viewed the Covina properties as essential to the dealership project in 2003 when the dealerships were located in Covina. The letter fails to demonstrate that the Covina properties were used as of the petition date to support the dealerships in any way.

The City also failed to demonstrate that all the Properties were acquired with funds from CorePointe or that CorePointe viewed the Properties as a single project.

The City merely established that Core-Pointe loaned Debtor in excess of $20 million over a period of six years and that the loans are secured on seven of the Properties. Such evidence fails to establish how the funds were used by Debtor.

Finally, Mr. Gage's testimony fails to establish that CorePointe viewed the Properties as a single project. Mr. Gage simply testified that had he known of the W. Orange St. and N. Citrus Ave. properties in 2006, CorePointe would have sought a security interest in these properties as well. First, Mr. Gage's testimony actually establishes that CorePointe was unaware of Debtor's entire portfolio, belying the contention that CorePointe saw all the Properties as a single project. Second, Mr. Gage's testimony fails to establish whether CorePointe viewed the properties as a single project at the time CorePointe loaned the funds to Debtor. Indeed, the deed of trust Mr. Gage testified about was executed in 2006—two years after Debtor acquired the last of the Properties. Finally, the fact that CorePointe would have demanded liens on the W. Orange St. and N. Citrus Ave. properties fails to prove that CorePointe saw the Properties as a single project. Rather, the statement merely demonstrates that CorePointe would have sought additional security for its loans to the Debtor.

 The physical location of the Properties and their proximity to other properties in the alleged project also belies the City's contentions. Courts evaluating whether a series of properties constitute a single project rely heavily on the proximity of the properties. Indeed, although the legislative history of § 101(51B) is sparse regarding the application of the "single project" provision, precedent makes clear that the majority of courts view the provision as an extension of the "single proper-

514

ty" provision intended to encompass projects, that due to their size, span several properties but function as a single asset. Courts seldom find that a series of properties constitute a single project unless the properties are contiguous and the properties are easily accessible from the adjacent properties. In other words, where access from one property to the other property or properties in an alleged project is impeded or denied by distance or barriers, courts are reluctant to find that the properties operate as a single project. *See, e.g., In re The McGreals*, 201 B.R. 736 (the court declined to find a single project because, *inter alia*, the properties were physically divided).

Here, the Properties are strewn across two cities and are divided by distance and infrastructure. And, although the infrastructure allows access from one property to the next, the general access allowed by ordinary thoroughfares does not arise to the level of interconnectedness required to demonstrate a single project. In fact, even the dealership properties are disconnected. The dealership properties exist on separate parcels and, except in the case of the Chevy Property and the Hummer Property, do not share common points of ingress or egress. Similarly, with the exception of 141 W. Geneva Pl., which is a composite property consisting of 141, 163 and 181 W. Geneva, and 129–137 W. Orange St., the Covina properties are stand-alone properties not directly accessible from the other Properties.

Lastly, the development plans for the Covina properties further demonstrate that the Properties do not serve a unitary purpose. In evaluating proposed development plans, courts will consider any plans regarding the future use of the subject properties to establish that a single project exists where the properties are undeveloped or as a defense to a finding that the properties constitute a single project. If asserted in defense, the debtor must support the alleged future use with more than testimony of mere intentions. *See In re Sargent Ranch LLC*, 2010 WL 3189714, at *3, 2010 Bankr.LEXIS 2607, at *7 (stating that "intentions do not constitute projects").

The evidence admitted on this point is sparse. During the hearing, Ziad Alhassen testified that Debtor acquired the Covina properties for future development. Debtor supported these contentions by offering development plans submitted to the City of Covina in 2000 and 2008 and the testimony of former City Manager for the City of Covina Paul Philips. The Court declined to admit the development plans on the grounds that they were irrelevant because they did not inform the Court about development plans for the Covina properties as of the petition date. Nonetheless, the testimony of Ziad Alhassen and Paul Philips contravene the City's contention that the Properties were used at all times as part of the dealership project.[16] The testimony also establishes that Debtor intends to redevelop the Covina properties for uses unrelated to the purported dealership scheme. And, although the Court did not admit the 2000 and 2008 plans, the fact that redevelopment plans in line with the City of Covina's intended development scheme for the area were proposed and exclusive negotiation agreements entered supports Ziad Alhassen's testimony that

**16.** The Court finds the City's arguments that the Debtor has not progressed to the permitting stages for the intended development and that some of the proposed development requires the acquisition of surrounding properties Debtor has yet to purchase unpersuasive and that these arguments fail to demonstrate that the Debtor's redevelopment plans are pie-in-the-sky intentions or that the Properties as a whole constitute a single project.

the Covina properties are intended for a non-automotive use in the future.

### *Conclusion*

The evidence presented certainly demonstrates an interrelation between Debtor, WCM and WCF and their respective operations. However, the record fails to evidence the sort of common use of the properties necessary to find that they constitute a single project under § 101(51B).

Wherefore, the Court DENIES the Motion for a determination that Debtor constitutes a single asset real estate entity under § 101(51B).